## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Art Van Furniture, LLC, *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| | |
| Alfred T. Giuliano, solely in his capacity as the Chapter 7 Trustee of Art Van Furniture, LLC, *et al.*, | |
| Plaintiff, | Adv. Proc. No. 22-_____ (CSS) |
| -against- | |
| Archie A. Van Elslander Trust dated November 26, 1982, as Amended, the Estate of Archie A. Van Elslander, Gary A. Van Elslander, Gary A. Van Elslander Revocable Trust, David P. Van Elslander, Debra A. Van Elslander, Debra A. Van Elslander Revocable Trust, Kenneth A. Van Elslander, Kenneth A. Van Elslander Revocable Trust, Sandra L. Seroka, Karen B. Paglino, Karen B. Paglino Revocable Trust, Lori J. Webb, Kim M. Van Elslander a/k/a Kim M. Campau, Kris A. Scarfone, Beth M. Wood, AV Conner Holdings, Inc., VEV Real Estate LLC, and Richard Kim Yost, and John Does 1-100, | |
| Defendants. | |

## COMPLAINT

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of. Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

Plaintiff, Alfred T. Giuliano, solely in his capacity as the chapter 7 trustee (the "Plaintiff" or "Trustee") of Art Van Furniture, LLC f/k/a Art Van Furniture, Inc. ("Art Van"),[2] Comfort Mattress, LLC f/k/a Comfort Mattress Co. ("Comfort"),  AVF Holding Company, Inc. ("Holdco"), each of their affiliated debtors (collectively, the "Debtors") and each of the Debtors' bankruptcy estates, by his undersigned counsel, files this complaint against the above-captioned Defendants and respectfully alleges as follows:

## NATURE OF THE ACTION

1.      By this Complaint, the Trustee seeks to avoid and recover more than $105 million in fraudulent transfers (collectively, the "Avoidable Transfers") made by certain Debtors within four years prior to the petition date to or for the benefit of Defendants, including: (i) more than $84,700,000 in value in certain real properties owned by Art Van that was transferred to or for the benefit of the VE Defendants (defined below); (ii) approximately $3,000,000 in value in a certain real property owned by Comfort that was transferred to or for the benefit of the VE Defendants; (iii) $8,000,000 in transfers by Art Van to Defendant Gary Van Elslander ("Gary"); (iv) at least $2,515,820 in transfers by Art Van to Defendant David Van Elslander ("David"); and (v) at least $7,000,000 in transfers by Art Van to Defendant Richard Kim Yost ("Yost").

2.      In addition, the Trustee seeks to recover damages for numerous breaches of fiduciary duties (collectively, the "Breaches of Duty") by Gary, David, Yost, and Archie A. Van Elslander ("Art").

3.      For more than 50 years, Art Van and its related companies were a successful and profitable family-owned and operated Midwest furniture retailer.  That all changed in 2017 when

---

[2] As discussed below, Art Van Furniture is also the successor by merger to AVASI, Inc. ("AVASI").

the VE Defendants decided to sell the business for approximately $620 million (defined below as the "Art Van Acquisition").

4.      The Art Van Acquisition was a highly leveraged transaction, accomplished by stripping the value out of the Debtors' owned real properties and saddling the Debtors with an unsustainable debt load, for the benefit of the Defendants and to the detriment of the Debtors and their creditors.

5.      Prior to the Art Van Acquisition, Art Van and Comfort owned at least five real Properties (as described more fully in paragraphs 75 and 76 below) worth at least $87,700,000. These included the Debtors' Headquarters (defined below), a sprawling corporate campus comprised of 13 buildings and approximately one million square feet of office, warehouse, and showroom space, worth more than $50,000,000. The Properties were not subject to any mortgage liens or other material encumbrances. In fact, prior to the Art Van Acquisition, the Debtors had no material secured debts.

6.      On the closing date, the Buyer (defined below) acquired all of the capital stock or membership interests in Art Van, Comfort, and certain related entities, which turned out to be worthless. Immediately prior to the transfers of capital stock or membership interests, the Buyer, or its designee, purchased certain specified owned real properties. In fact, all of the owned real properties, including the Debtors' Properties, were acquired by third party leasing companies as part of four sale-leaseback transactions entered into by the Buyer to finance approximately 70% of the total purchase price paid to the VE Defendants. The Debtors received **none** of the consideration for their Properties. Instead, the Debtors had to pay significant new rent obligations for the Properties they previously owned free and clear.

7.      Prior to the Art Van Acquisition, the Company (defined below) paid less than $23 million per year in total lease obligations and had $136.5 million in total future lease obligations. After the Art Van Acquisition, and as a direct result of the sale-leaseback transactions used to finance the bulk of the Avoidable Transfers to Defendants, the Debtors' minimum lease obligations ballooned to nearly $46 million per year and more than **$877 million** in total future operating lease obligations.

8.      In addition to the sale-leaseback transactions, the Buyer borrowed heavily to finance the purchase price, including a $100 million term loan and $1 million from a revolving line of credit, which were secured by substantially all of the Debtors' assets, and a $45 million shareholder note from the new owners.  The Debtors also booked more than $109 million in additional financing liabilities.   Much of the $254 million in new funded debt obligations carried high interest rates, reflecting a substantial risk premium.  For example, the term loan, which was secured by a lien on substantially all of the assets, had an effective interest rate of 8.52% and the financing liability relating to a failed sale-leaseback had an implied borrowing rate of 9.1%, according to the Debtors' 2017 financial statements.  At the time, the interest rate on AAA-rated corporate bonds was around 4%.   The debt service on these new funded debt obligations totaled at least $10,382,000 in just the last seven months of the 2017 fiscal year.

9.      As a result of the foregoing, the Debtors were obligated to pay approximately **$33.4 million per year** in interest expenses and lease obligations **more** than they paid prior to the Art Van Acquisition.  That amount far exceeded the average net earnings generated by the business and even exceeded the highest net earnings ever generated by the business.

10.     In fact, the Avoidable Transfers exceeded the total stockholder equity in the Company.[3]

11.     Put simply, Defendants took more than they were entitled to and they left behind a business that had been rendered insolvent, had unreasonably small capital in relation to its business and the transaction, and had incurred debts beyond its ability to pay as they became due.

12.     The stripping of value to fund the Avoidable Transfers to Defendants was materially aided by numerous Breaches of Duty by Art, Gary, David, and Yost (collectively, the "Fiduciary Defendants"), each of whom was a director or officer of the Company.

13.     The Fiduciary Defendants ignored red flags and put their own self-interest and the interests of the other Defendants ahead of the best interests of the Debtors.  For example, Art, Gary, and David knew about the sale-leaseback transactions and signed off on closing statements showing the Properties were being stripped out and sold to third parties.  They even commissioned an appraisal report of the real properties for "potential sale leaseback purposes."

14.     The Fiduciary Defendants knew, or should have known, the Art Van Acquisition was a risky, highly leveraged transaction.  For example, at the time the parties signed the purchase agreement, the Buyer had an equity commitment of up to $216 million.  Just six weeks later, at closing, the equity commitment had dropped to $70 million, with the balance paid from additional debt.

15.     After the Art Van Acquisition closed, Gary and Yost remained directors and/or officers and they committed additional Breaches of Duty by, among other things, failing to address the massive debt and lease obligations arising from the Art Van Acquisition, approving the ill-conceived acquisitions of Levin Furniture and Wolf Furniture, each described below, approving

---

[3] As discussed below, Defendants actually received more than $600 million in total as a result of the Art Van Acquisition and the related Avoidable Transfers, many times the total stockholder equity in the Company.

additional borrowing and lease obligations that the Debtors could not pay, and engaging in other self-interested transactions.

16.     The motivation for the Fiduciary Defendants' Breaches of Duty, and the Trust's aiding and abetting of the Breaches of Duty by Art, is readily apparent:  They and the other Defendants were the principal beneficiaries of the Art Van Acquisition and related stripping of value from the Debtors.  In particular, Art's Trust received more than $529 million and entities controlled by Gary, David, and Art's other children received more than $75 million.  Gary, David, and Yost each received multi-million dollar Avoidable Transfers.  By contrast, the Debtors were left with just $2 million in cash.

17.     Predictably, the Debtors sustained massive losses as a result of the Avoidable Transfers and the Breaches of Duty.  By September 30, 2017, just seven months after the Art Van Acquisition closed, the Debtors had already lost nearly $22.5 million.  Two years later, the Debtors' total losses had reached nearly $189 million.  Months later, the bankruptcy filings followed and creditors were left holding hundreds of millions of dollars in unpaid claims.

18.     The Trustee brings this action pursuant to Part VII of the Federal Rules of Bankruptcy Procedure, on behalf of the Debtors and their creditors, seeking the entry of a judgment, among other things: (i) avoiding and recovering the Avoidable Transfers made by the Debtors to or for the benefit of one or more of the Defendants pursuant to 11 U.S.C. §§ 544, 548, 550 and applicable state law; (ii) imposing liability on the Fiduciary Defendants for their Breaches of Duty pursuant to applicable law; (iii) imposing liability on the Trust for aiding and abetting Breaches of Duty by Art pursuant to applicable law; (iv) disallowing any proofs of claim filed by Defendants against the Debtors' estates pursuant to 11 U.S.C. § 502(d); and (v) granting the Trustee other relief as set forth in this Complaint.

## JURISDICTION AND VENUE

19.     Subject matter jurisdiction over this Adversary Proceeding exists pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated February 29, 2012.

20.     Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a) and (c).  This adversary proceeding is related to the above-captioned jointly administered bankruptcy cases pending before this Court under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").

21.     The predicates for the relief sought herein are sections 105(a), 502, 544, 548, and 550 of the Bankruptcy Code, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable state law.

22.     Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff does not consent to the entry of final orders or judgments by a bankruptcy judge.

23.     The District of Delaware has personal jurisdiction over each of the Defendants under Bankruptcy Rule 7004.  In addition, personal jurisdiction exists with respect to each of the Defendants because they were a director, officer, control person, or insider of one or more of the Debtors, and each of the Defendants had multiple, meaningful contacts in the State of Delaware relative to business activities and transactions which they availed themselves of and which directly and adversely affected the Debtors as well as the Debtors' creditors.  Further, each of the Defendants consented to jurisdiction in Delaware for any actions arising from or relating to the Purchase Agreement (defined below).  Moreover, certain Defendants filed proofs of claim and thereby submitted to this Court's jurisdiction.

## PARTIES

24.      Plaintiff, Alfred T. Giuliano, is the duly appointed chapter 7 Trustee of the Debtors.

25.      Debtor Art Van was formed on September 15, 1964, as Art Van Furniture – Tech Plaza, Inc., a Michigan corporation.  Art Van was a furniture and mattress retailer.  On May 21, 1986, Art Van's name was changed to Art Van Furniture, Inc.  On February 28, 2017, Art Van was converted from a Michigan corporation to a Delaware limited liability company.  Effective as of March 1, 2017, Art Van was acquired by the Buyer.

26.      Debtor Comfort was formed on March 6, 1981 as a Michigan corporation.  Comfort manufactured mattresses that it sold to Art Van.  On February 28, 2017, Comfort was converted from a Michigan corporation to a Delaware limited liability company.  Effective as of March 1, 2017, Comfort was acquired by the Buyer.

27.      AVASI was formed on September 11, 1975 as a Michigan corporation.  AVASI provided delivery, warehousing, repair, advertising and/or other services to Art Van.  Effective as of March 1, 2017, AVASI was acquired by the Buyer.  On or about September 30, 2019, AVASI was merged into Art Van.

28.      Debtor AVF Parent, LLC ("Buyer") is a Delaware limited liability company that was formed in January 2017 for the purposes of acquiring the equity interests in Art Van, Comfort, AVASI, and certain related entities and properties.

29.      Debtor AVF Holdings II, LLC ("Holdings II") is a Delaware limited liability company that was organized in or about January 2017 in connection with the Art Van Acquisition. Holdings II is the sole member of the Buyer.

30.    Debtor AVF Holdings I, LLC ("Holdings I") is a Delaware limited liability company that was organized in or about January 2017 in connection with the Art Van Acquisition. Holdings I is the sole member of Holdings II.

31.    Debtor AVF Holding Company, Inc. ("Holdco") is a Delaware corporation that was incorporated in or about January 2017 in connection with the Art Van Acquisition.  Holdco is the sole member of Holdings I and is the indirect parent of each of the other Debtors.   Upon information and belief, from and after March 1, 2017, the Board of Directors of Holdco acted as the board of each of the Debtors.

32.    Debtor Sam Levin, Inc. ("Sam Levin") is a Pennsylvania corporation that was incorporated in or about 1959.  Effective as of November 22, 2017, Sam Levin was acquired by a subsidiary of the Buyer.

33.    Defendant Archie A. Van Elslander was the founder of Art Van.  Prior to March 1, 2017, Art was the sole director of Art Van and was one of the directors of Comfort and AVASI. Upon information and belief, Art passed away on or about February 12, 2018.  Accordingly, the estate of Archie A. Van Elslander ("Art's Estate") is named as a defendant in this adversary proceeding.

34.    Defendant Archie A. Van Elslander Trust dated November 26, 1982, as Amended (the "Trust") is a trust that was formed by or for the benefit of Art.  Upon information and belief, prior to and as of March 1, 2017, Art was the trustee of the Trust.  In or after 1982, Art transferred his ownership interests in, among other entities, Art Van, Comfort and AVASI, to the Trust.  In addition, at the time of the Art Van Acquisition, the Trust owned approximately 22 real properties that were leased to Art Van and its affiliated companies.  Upon further information and belief, at closing, the Trust received at least $529,260,163 of the purchase price.

35.     Defendant Gary A. Van Elslander is the son of Art.  Prior to March 1, 2017, Gary was the President of Art Van, an officer of Comfort, and a director of AVASI, among other things. In addition, from on or about March 1, 2017 until on or about March 1, 2020, Gary served as a director of Holdco.  Upon information and belief, Gary is the current trustee of the Trust.  Upon further information and belief, in or about March 2017, Gary received one or more transfers from Art Van totaling at least $8,000,000.  Additionally, upon information and belief, Gary is a manager of Defendant VEV Real Estate LLC and a director and officer of Defendant AV Conner Holdings, Inc.

36.     Defendant Gary A. Van Elslander Revocable Trust ("Gary's Trust") is a trust that was formed by or for the benefit of Gary.  Upon information and belief, Gary is the Trustee of Gary's Trust.  Upon further information and belief, at closing, Gary or Gary's Trust received at least $2,549,080 of the purchase price.

37.     Defendant David P. Van Elslander is a son of Art.  Prior to March 1, 2017, David was an officer of Art Van, a director of Comfort, and a director of AVASI, among other things. Upon information and belief, at closing, David received at least $2,549,080 of the purchase price. Upon further information and belief, in or about March 2017, David received one or more transfers from Art Van totaling at least $2,515,820.

38.     Defendant Debra A. Van Elslander ("Debra") is a daughter of Art.  Prior to March 1, 2017, Debra was a director of AVASI.

39.     Defendant Debra A. Van Elslander Revocable Trust ("Debra's Trust") is a trust that was formed by or for the benefit of Debra.  Upon information and belief, Debra is the Trustee of Debra's Trust.  Upon further information and belief, at closing, Debra or Debra's Trust received at least $2,549,080 of the purchase price.

40.     Defendant Kenneth A. Van Elslander ("Kenneth") is a son of Art.  Prior to March 1, 2017, Kenneth was a director of AVASI.  Upon information and belief, Kenneth is or was a manager of Defendant VEV Real Estate LLC and an officer of Defendant AV Conner Holdings, Inc.

41.     Defendant Kenneth A. Van Elslander Revocable Trust ("Kenneth's Trust") is a trust that was formed by or for the benefit of Kenneth.  Upon information and belief, Kenneth is the Trustee of Kenneth's Trust.  Upon further information and belief, at closing, Kenneth or Kenneth's Trust received at least $2,549,080 of the purchase price.

42.     Defendant Sandra L. Seroka ("Sandra") is a daughter of Art.  Upon information and belief, at closing, Sandra received at least $2,549,080 of the purchase price.

43.     Defendant Karen B. Paglino ("Karen") is a daughter of Art.

44.     Defendant Karen B. Paglino Elslander Revocable Trust ("Karen's Trust") is a trust that was formed by or for the benefit of Karen.  Upon information and belief, Karen is the Trustee of Karen's Trust.  Upon further information and belief, at closing, Karen or Karen's Trust received at least $2,549,080 of the purchase price.

45.     Defendant Lori J. Webb ("Lori") is a daughter of Art.  Upon information and belief, at closing, Lori received at least $2,549,080 of the purchase price.

46.     Defendant Kim M. Van Elslander a/k/a Kim M. Campau ("Kim") is a daughter of Art.  Upon information and belief, at closing, Kim received at least $2,549,080 of the purchase price.

47.     Defendant Kris A. Scarfone ("Kris") is a daughter of Art.  Upon information and belief, at closing, Kris received at least $2,549,080 of the purchase price.

48.     Defendant Beth M. Wood ("Beth") is a daughter of Art.  Upon information and belief, at closing, Beth received at least $2,549,080 of the purchase price.

49.     Collectively, Gary, David, Debra, Kenneth, Sandra, Karen, Lori, Kim, Kris, and Beth are referred to herein as the "Van Elslander Siblings."

50.     Nonparty AV Conner, LLC, f/k/a Art Van Furniture – Conner, Inc. ("Conner") operated five Art Van Furniture-branded stores in Michigan and owned certain related real properties prior to the Art Van Acquisition.  Upon information and belief, Conner had been owned directly or indirectly by the Van Elslander Siblings or their respective trusts.  On or about February 27, 2017, all of the equity interests in Conner were transferred to Defendant AV Conner Holdings, Inc.  Effective as of March 1, 2017, Conner was acquired by the Buyer.

51.     Defendant AV Conner Holdings, Inc. ("Conner Holdings") is a Michigan corporation that was incorporated on or about February 23, 2017 in connection with the Art Van Acquisition.  Upon information and belief, Conner Holdings is owned directly or indirectly by the Van Elslander Siblings or their respective trusts.  Upon further information and belief, Conner Holdings and/or its beneficial owners—the Van Elslander Siblings or their respective trusts—received at least $25,490,795 of the purchase price.

52.     Defendant VEV Real Estate, LLC ("VEV") is a Michigan limited liability company that owned or controlled certain real property that was leased to Art Van.  Upon information and belief, VEV is owned directly or indirectly by the Van Elslander Siblings or their respective trusts.  Upon further information and belief, at closing, VEV or its beneficial owners—the Van Elslander Siblings or their respective trusts—received at least $49,746,839 of the purchase price.

53.     Collectively, the Trust, Art's Estate, Gary, Gary's Trust, David, Debra, Debra's Trust, Kenneth, Kenneth's Trust, Sandra, Karen, Karen's Trust, Lori, Kim, Kris, Beth, Conner Holdings, and VEV are referred to in this Complaint as the "VE Defendants."

54.     Defendant Richard Kim Yost was the Chief Executive Officer of Art Van from in or about October 2009 through on or about March 1, 2017.  Further, from on or about March 1, 2017 through in or about June 2018, Yost was the Chief Executive Officer and a director of Holdco and the other Debtors.   Upon information and belief, in or about March 2017, Yost received one or more transfers from Art Van totaling at least $6,000,000.  Upon further information and belief, in or about June 2018, Yost received one or more transfers by Art Van totaling at least $1,000,000.

55.     Upon information and belief, John Does 1-100 include, among others, certain former directors, officers, managers, fiduciaries, or equity interest holders of one or more the Debtors or their affiliates; one or more transferees of certain of the Avoidable Transfers; the personal representatives of the estates of one or more of the Defendants; and/or their respective affiliates, successors or assigns.

## FACTS COMMON TO ALL COUNTS

**A.      The Company Thrived Before the Art Van Acquisition.**

56.     In 1959, Art opened his first furniture retail store in suburban Detroit.

57.     On September 15, 1964, Art formed Art Van as a Michigan corporation.  Until the bankruptcy, Art Van would remain the largest and most important operating entity within the business.

58.     Art was one of the original directors of Art Van and he remained on the board until March 1, 2017.  At the time of the Art Van Acquisition, Art was the sole director of Art Van.

59.     In 1976, Art Van purchased headquarters located at 6500 E. 14 Mile Road in Warren, Michigan (the "Headquarters").   By March 2017, the Headquarters consisted of 13 buildings and approximately 1 million square feet of office, warehouse, and showroom space.

60.     Art Van remained the fee owner of the Headquarters from 1976 until on or about March 2, 2017.

61.     In the decades following its formation, the Art Van business steadily grew from its base in Michigan to include more than 110 freestanding Art Van and Pure Sleep branded stores, including franchise locations, as well as branded "stores-within-stores," located in Michigan, Illinois, Indiana, Ohio, and Iowa, with nearly 4,000 employees.

62.     Art Van remained a family-owned and operated business until on or about March 1, 2017.

63.     Several of Art's children, including Gary and David, joined the business and became directors and officers.

64.     As the business grew, the Art Van business grew to include several additional entities.   These included (i) Art Van and its wholly owned subsidiaries, Art Van Furniture - Midwest, LLC, AVCE, LLC and its wholly owned subsidiary, AVF Franchising, LLC, AV Pure Sleep Franchising, LLC and Liberty Finance, LLC and its 51% interest in a subsidiary; (ii) Comfort; (iii) AVASI; and (iv) Conner (collectively, the "Company"), among others.[4]  Prior to the Art Van Acquisition, the Company issued combined financial statements.

65.     In or after 1982, Art transferred his ownership interests in Art Van, Comfort, and AVASI to his Trust.  Upon information and belief, Art remained the trustee of the Trust until at least March 1, 2017.

---

[4] On or about September 28, 2017, Art Van Furniture - Midwest, LLC was merged into Art Van.  AVCE, LLC, AVF Franchising, LLC, and AV Pure Sleep Franchising, LLC, among others, are Debtors.

66.     Upon further information and belief, Conner and VEV were owned, directly or indirectly, by the Van Elslander Siblings, or their respective trusts.

67.     According to the Company's audited financial statements, the business was thriving and generated strong profits prior to the Art Van Acquisition.

68.     For example, during the fiscal years ended September 30, 2011 through September 30, 2016, the Company generated combined net income of $101,222,130, or an average of nearly $16.9 million in net income per year.

69.     The Company's audited financial statements for the fiscal year ended September 30, 2015, reflect, among other things, more than $300 million in total assets, current liabilities totaling approximately $125 million, long-term liabilities totaling approximately $105 million (inclusive of capital lease obligations), and more than $92 million in stockholder equity.

70.     The Company generated more than $26.5 million in net income in fiscal year 2015.

71.     The Company's audited financial statements for the fiscal year ended September 30, 2016 (the "2016 Financial Statements"), reflect, among other things, more than $323.6 million in total assets, current liabilities totaling approximately $122.9 million, long-term liabilities totaling approximately $114.8 million (inclusive of capital lease obligations), and nearly $95 million in stockholder equity.

72.     The Company generated more than $32.5 million in net income in fiscal year 2016.

73.     Notably, in connection with the Art Van Acquisition, the Company had no material bank debt.  In particular, Art Van, which at the time had a lending relationship with Bank of America, obtained a payoff statement dated February 21, 2017 that reflects a $0.00 payoff amount.

**B.     The VE Defendants Decide to Cash Out.**

74.     In or about 2016, the VE Defendants decided to sell their interests in the Company and certain related real properties.

75.     At that time, Art Van owned, among other things, the following commercial real properties (collectively, the "Art Van Properties"):

      a.     1301 E. Mall Dr. Holland, Ohio;

      b.     6340 E. 14 Mile Rd. Warren, Michigan;

      c.     6500 E. 14 Mile Rd. Warren, Michigan (the Headquarters); and

      d.     13855 E. 8 Mile Rd., Warren, Michigan.

76.     Also, at that time, Comfort owned, among other things, a commercial real property located at 30500 Little Mack Avenue, Roseville, Michigan (the "Comfort Property" and, together with the Art Van Properties, the "Properties").

77.     None of the Properties was subject to a recorded mortgage lien or other material encumbrance.

78.     In connection with the sale process for the Company, a Confidential Information Presentation, dated as of August 2016 (the "CIP"), was prepared.  Among other things, the CIP touted the Company's "Significant Owned Real Estate Portfolio" and states the Company owned 74% of its total retail square footage.

79.     In or about September 2016, a real estate appraisal report was commissioned for 38 real properties, including the Headquarters, owned or leased by Art Van, Comfort, the Trust, and VEV.  The appraisal, which was addressed to Gary, states the "intended use of the appraisal is for potential sale leaseback purposes . . . ."

80.     Among other things, the appraisal listed a $51,600,000 valuation for the Headquarters.

81.   In January 2017, the VE Defendants agreed to sell the Company (the "Art Van Acquisition") to the Buyer for a base purchase price of $612,500,000, subject to certain adjustments.

82.   Specifically, on January 16, 2017, Art, each of the Van Elslander Siblings, the Trust, Art Van, Comfort, AVASI, Conner and VEV, as sellers, and the Buyer, as buyer, entered into that certain Equity Purchase Agreement (as amended, and together with all exhibits, schedules, and attachments thereto, the "Purchase Agreement").

83.   Art and each of the Van Elslander Siblings signed the Purchase Agreement in one or more capacities.

84.   Upon information and belief, Yost, as the Chief Executive Officer of the Company, provided material assistance to the VE Defendants in negotiating and implementing the Purchase Agreement and related transactions to effectuate the Art Van Acquisition.

85.   The Buyer was a newly formed Delaware limited liability company with no assets.

86.   The Buyer obtained an equity commitment letter, dated as of January 16, 2017, stating it would receive up to $216 million in cash for its equity interests.  Ultimately, however, the capital contribution was only around $70 million, plus a $45 million shareholder note.

87.   Upon information and belief, the Buyer and its sponsors had no previous experience in the furniture retail market.

88.   Pursuant to the terms of the Purchase Agreement, Defendants received or were entitled to receive information about, among other things, the sale-leaseback transactions, equity commitment, and funded debt incurred to fund the purchase price.

89.   The sale-leaseback transactions were contemplated in the Purchase Agreement. Among other things, the Purchase Agreement makes multiple references to the Buyer "or its

designee" acquiring title to the owned real properties, including the Properties. The Purchase Agreement required Defendants to provide "any potential purchaser" of such properties with reasonable access and the right to inspect such properties. The Purchase Agreement also required Defendants to "obtain surveys and title insurance" and/or "other information or deliverables reasonably necessary for any sale-leaseback financing."

90.    Also, on January 16, 2017, the Buyer entered into four separate sale-leaseback agreements (the "Sale-Leaseback Agreements") with certain third-party commercial landlords (collectively, the "Landlords").

91.    The Sale-Leaseback Agreements were expressly conditioned on the Art Van Acquisition closing and they contemplated that, at closing, the Buyer would cause the sale of certain owned real properties, including the Properties, to the Landlords and, in return, receive cash to fund the purchase price and 20-year leases for the formerly owned real properties.

92.    In addition, in connection with the Art Van Acquisition, in January 2017, Art Van's employment agreements with certain officers and executives were amended. In particular:

    a.    Yost, on behalf of Art Van, executed an amendment dated January 13, 2017 to Gary's employment agreement with Art Van to provide for, among other things, the payment to Gary of an $8,000,000 "success fee" at closing;

    b.    Gary, on behalf of Art Van, executed an amendment dated January 14, 2017 to Yost's employment agreement with Art Van to provide for, among other things, the payment to Yost of a $6,000,000 "success fee" at closing; and

    c.    Yost, on behalf of Art Van, executed an amendment dated January 13, 2017 to David's employment agreement with Art Van to provide for, among other things, the payment to David of a success fee and/or other bonus payments totaling at least $2,515,820 at closing.

## C.    The Pre-Closing Restructurings.

93.    Shortly before the closing, in late-February 2017, the VE Defendants undertook a series of corporate restructurings.

94.    For example:

a.    AVF Holdings, Inc., a Michigan corporation, was formed to hold the equity interests in Art Van.  Upon information and belief, the Trust owned AVF Holdings, Inc.;

b.    Comfort Mattress Holdings, Inc., a Michigan corporation, was formed to hold the equity interests in Comfort.  Upon information and belief, the Trust owned Comfort Mattress Holdings, Inc.; and

c.    Defendant Conner Holdings was formed to hold the equity interests in Conner.

95.    On or about February 28, 2017, one day prior to the closing, Art Van, Comfort, and Conner each were converted from Michigan corporations to Delaware limited liability companies.[5]

96.    The VE Defendants also undertook certain steps to restructure the ownership of certain real properties, including the Properties.

97.    For example, Gary executed a warranty deed, dated as of February 24, 2017, transferring Comfort's interest in the Comfort Property to VEV, an entity controlled by Gary and the other Van Elslander Siblings, for one dollar.

98.    Gary also executed a Covenant Deed, dated as of February 24, 2017, with an effective date of March 2, 2017, transferring Art Van's title to the Headquarters to an affiliate of one of the Landlords.

99.    Also prior to the closing, the boards of Art Van, Comfort, AVASI, and certain other entities ratified, authorized, or approved the various transactions undertaken in connection with the sale of the Company to the Buyer.

100.    For example, Art, both in his capacity as the trustee of the Trust (the shareholder of Art Van), and in his capacity as the sole director of Art Van, executed a Written Consent dated as

---

[5] AVASI remained a Michigan corporation until in or about September 2019, when it was merged into Art Van Furniture.

of February 23, 2017 (the "Art Van Written Consent"), that purported to ratify, authorize, approve "in all respects" Art Van's entry into the Purchase Agreement, the corporate restructurings, the Bonus Payments, and certain "Pre-Closing Real Property Actions" (as defined therein), among other things.

101.    Also, Art, as trustee of the Trust (the shareholder of Comfort), and Art and David, as the directors of Comfort, executed a Written Consent, dated as of February 23, 2017 (the "Comfort Written Consent"), that purported to ratify, authorize, approve "in all respects" Comfort's entry into the Purchase Agreement, the corporate restructurings, and the Bonus Payments, among other things.  The Comfort Written Consent did not specifically authorize any actions with respect to the Comfort Property.

102.    Similarly, Art, as trustee of the Trust (the shareholder of AVASI), and Art, Gary, David, Debra, and Kenneth, as the directors of AVASI, executed a Written Consent, dated as of February 27, 2017 (the "AVASI Written Consent" and together with the Art Van Written Consent and the Comfort Written Consent, the "Written Consents") that purported to ratify, authorize, approve "in all respects" AVASI's entry into the Purchase Agreement, among other things.

103.    Effective as of March 1, 2017 (the "Closing Date"), the Art Van Acquisition closed.

104.    Also, effective as of the Closing Date, 39 real properties, including the Properties, were sold to and immediately leased back from the Landlords, pursuant to the Sale-Leaseback Agreements.

105.    In addition, on March 1, 2017, the Buyer entered into the following secured financing agreements in order to fund a substantial part of the purchase price paid to the VE Defendants (together, the "Credit Agreements"):

    a.    a $100,000,000 term loan to be funded on the Closing Date, with a delayed draw of $30,000,000, that was due to mature on February 28, 2024; and

      b.     an ABL credit agreement (also referred to as the revolving line of credit) in an amount of up to $60,000,000, that was due to mature on February 28, 2022.

106.    Art Van, Comfort, and certain other Debtors were guarantors of the above-described secured debts. Those debts were secured by liens on and security interests in substantially all the assets of, among others, Art Van and Comfort.

107.    Upon information and belief, as of February 28, 2017, one day prior to the Closing Date, Art Van owed various trade creditors and other unsecured creditors at least $6.6 million, and Comfort owed various unsecured creditors approximately $435,000.

108.    After the Closing Date and the consummation of the sale-leaseback transactions, the Debtors owed four of their landlords, collectively, more than $877 million in total future operating lease obligations.

109.    Additionally, on or after the Closing Date, a new board of directors was constituted for Holdco and its subsidiaries, including the Buyer. The directors included, among others, Gary and Yost.

**D.    Defendants Receive the Value Stripped from Art Van's and Comfort's Properties.**

110.    According to the audited consolidated financial statements of Holdco and its subsidiaries for the fiscal year ended September 30, 2017 (the "2017 Financial Statements"), which was the first fiscal year end after the Closing Date, the total purchase price paid for the Company was "approximately $621,514,000," which included certain acquired cash.

111.    The 2017 Financial Statements state that the purchase price was funded from the following sources:

      a.     the $100 million secured term. According to the 2017 Financial Statements, the weighted average borrowing rate was 8.52% on the term loan. As discussed above, prior to the Art Van Acquisition, Art Van had **no** funded debt;

      b.      $1 million from the secured revolving line of credit;

      c.      approximately $70,000,000 in a capital contributions provided by certain investment funds affiliated with the private equity firm;

      d.      $45,000,000 in the form of one or more shareholder notes in favor of those investment funds; and

      e.      $434,493,000 from the sale-leaseback transactions.

112.    According to the Funds Flow Calculation, dated as of February 24, 2017, the purchase price was distributed as follows:

      a.      $529,260,163 to the Trust;

      b.      $49,746,839 to VEV, an entity controlled by the Van Elslander Siblings;

      c.      $25,490,795 to Conner Holdings or its shareholders, the Van Elslander Siblings;

      d.      $19,242,045 to pay certain "Employee Obligations." These included, among other things, $8,000,000 to Gary; $2,515,820 to David; and $6,000,000 to Yost;

      e.      $6,783,703 to pay advisors, legal counsel, and other service providers;

      f.      $9,875,000, which was placed in certain escrows; and

      g.      $2,000,000 in cash, which was left in the business.

113.    In total, according to the Funds Flow Calculation, Defendants collectively received more than $600 million as a result of the Art Van Acquisition.

114.    As set forth above, just $70 million—or around 11%—of the total purchase price came in the form of equity. The remaining 89% came from new debt and the sale-leaseback transactions.

115.    The sale-leaseback transactions accounted for $434,493,000—or approximately 70%—of the total purchase price.

116.    While the Sale-Leaseback Agreements were between the Buyer and the respective Landlord, in practice certain Properties were transferred directly from the Debtor to the Landlord.

In particular, the Headquarters was transferred directly from Art Van to that Landlord, not the Buyer.  However, the purchase price paid by the Landlord went to the Buyer and then to the VE Defendants, not to Art Van.

117.    According to the Sale-Leaseback Agreements and public land records, the Landlords paid at least $84,700,700 for the Art Van Properties and approximately $3,000,000 for the Comfort Property.

118.    The following chart summarizes the Art Van Properties and the Comfort Property, the purchase prices paid by the Landlords for each Property, and the new annual base rents that the Debtors were obligated to pay for such Properties for the first year under the Sale-Leaseback Agreements:

| Owner prior to Closing Date | Street Address | Allocated purchase price | Annual base rent (year 1) |
|---|---|---|---|
| Art Van | 1301 E. Mall Dr. Holland, Ohio | $15,488,193 | $1,184,846.80 |
| Art Van | 6340 E. 14 Mile Rd. Warren, Michigan | $6,901,409 | $514,155.22 |
| Art Van | 6500 E. 14 Mile Rd. Warren, Michigan | $54,801,704 | $4,069,026.50 |
| Art Van | 13855 E. 8 Mile Rd. Warren, Michigan | $7,528,438 | $575,925.53 |
| Comfort | 30500 Little Mack Ave. Roseville, Michigan [6] | $3,000,000 (est.) | $225,000 (est.) |
| **Estimated Totals:** | | **$87,700,000[+]** | **$6,500,000[+]** |

119.    Art Van and Comfort received none of the consideration paid for their Properties.

120.    Instead, the Debtors now had to pay more than $6.5 million per year in rent for the Properties that Art Van and Comfort previously owned free and clear.

---

[6] As discussed above, on February 24, 2017, shortly before the Closing Date, the Comfort Property was transferred to VEV, which owned an adjacent real property, in exchange for $1.  The combined property was then sold and leased back without properly accounting for or tracking the formerly Comfort-owned portion and the VEV-owned portion.

121.    Worse still for the Debtors, the Sale-Leaseback Agreements provided for annual increases to the base rent equal to either 2% of the base rent or "the lesser of 2% or 1.25x price index change."

122.    According to the 2017 Financial Statements, one of the sale-leaseback transactions failed the test to be accounted for as a true sale-leaseback due to a prohibited form of continuing involvement.  The Debtors accounted for this transaction in the 2017 Financial Statements as a $109,680,000 financing liability, with an implied borrowing rate of 9.1%.

123.    The Debtors also incurred more than $24 million dollars in fees and expenses relating to the Art Van Acquisition.  These included financing fees of $4,871,000, sponsor fees of $4,951,000, professional fees of $5,852,000, and sale leaseback fees of $8,399,000, according to the 2017 Financial Statements.

124.    In short, the Art Van Acquisition was a highly leveraged transaction funded primarily from the equity in the Properties and other real properties and approximately $254 million in new debt, all or substantially all of which benefited Defendants, while the Debtors were rendered insolvent, had unreasonably small capital in relation to their business and the transaction, and had incurred debts beyond their ability to pay as such debts became due.

**E.    The Art Van Acquisition Leaves the Debtors in a Dire Financial Condition.**

125.    The substantial harm caused to the Debtors by the combination of the sale-leaseback transactions and heavy borrowing used to fund Avoidable Transfers to Defendants is readily apparent from their audited financial statements.

126.    For example, according to the 2016 Financial Statements, which cover the last fiscal year end prior to the Closing Date, the Company had operating lease and capital lease obligations for the next fiscal year of $22,955,119.

127.    By contrast, according to the 2017 Financial Statements, which cover the fiscal year end after the Closing Date, the operating lease and capital lease obligations for the next fiscal year had **doubled** to $45,948,000.

128.    Even more dramatically, for the 2016 fiscal year, all future lease obligations of the Company totaled just $136,574,447.

129.    By contrast, the 2017 Financial Statements reflect total future lease obligations of $877,512,000, more than six times the total lease obligations one year earlier.

130.    In both the 2015 and 2016 fiscal years, the Company reported **no** long-term debts on its audited financial statements.

131.    By contrast, the 2017 Financial Statements show approximately $254 million in new long-term debts, including (i) $98,750,000 in term loan debt, (ii) $45,540,000 in shareholder note payable, and (iii) $109,680,000 in financing liabilities relating to the sale-leaseback that failed an accounting test and had to be accounted for as debt (collectively, the "funded debt").

132.    The 2017 Financial Statements also reflect at least $10,382,000 in annual interest expenses relating to the funded debt.

133.    Art Van, Comfort and their affiliated Debtors were borrowers, guarantors, or otherwise obligors of the term loan and the revolving line of credit, which were used to fund the Avoidable Transfers to Defendants.

134.    In the six fiscal years prior to the Art Van Acquisition, the Company averaged around $16.9 million in net earnings per year.  After the Art Van Acquisition, the Debtors would never have a profitable fiscal year.

135.    As stated above, as a result of the Sale-Leaseback Agreements and funded debt used to finance the Avoidable Transfers to Defendants, the Debtors were saddled with $23 million

in additional lease obligations and around $10.4 million or more in new interest expenses per year. Collectively, these amounts far exceeded the annual net earnings generated by the Company prior to the Art Van Acquisition.

136.    Further, prior to the Closing Date, the Properties were among the most significant assets of both Art Van and Comfort.  Defendants' touted the real properties as a "significant" asset in the CIP, noting the Company owned, among other things, 74% of its retail square footage. Further, through the sale-leaseback transactions, the Properties and other owned real properties contributed approximately 70% of the total Avoidable Transfers to Defendants.

137.    After the Closing Date, the assets of Art Van, Comfort, and the other Debtors were greatly diminished.  Such assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "good will."

138.    The 2016 Financial Statements reveal that, prior to the Closing Date, Art Van and the Company recorded <u>no</u> intangible assets and just $4,344,616 in goodwill.

139.    By contrast, after the Closing Date, the 2017 Financial Statements include $46,891,000 in intangible assets and $14,314,000 in goodwill, which total $61,205,000.  This is despite the fact that the business had been stripped of its crown jewels, the Headquarters and other Properties, and had been saddled with excessive and unsustainable funded debt and lease obligations.

140.    In short, the Art Van Acquisition rendered Art Van, Comfort, and the other Debtors insolvent, having unreasonably small capital in relation to their business and the transaction, and having incurred debts beyond their ability to pay as such debts became due.

141.    It is therefore not at all surprising that, just seven months after the Closing Date, the Debtors posted a significant loss of $22,462,000 for the 2017 fiscal year – the first loss in at least 10 years.

142.    The Debtors' losses would continue to grow, as a result of the highly leveraged Art Van Acquisition, of which Defendants were the principal beneficiaries.

**F.    Compounding the Debtors' Dire Financial Condition, the Board Pursues More Acquisitions, Fueled by Even More Debt and Sale-Leaseback Transactions.**

143.    Less than two months after the 2017 fiscal year closed with a loss of approximately $22.5 million, the Debtors' board authorized another round of massive borrowing and additional sale-leaseback transactions, in an ill-fated attempt to rescue the business from the devastating effects of the Art Van Acquisition and the stripping of value for the benefit of Defendants.

144.    Effective as of November 22, 2017, the Debtors, through a newly formed entity called Levin Parent, LLC, entered into that certain Stock Purchase Agreement to acquire all of the capital stock of Sam Levin and certain real properties related to the Levin Furniture business ("Levin") for approximately $183,201,000 (the "Levin Acquisition").

145.    Sam Levin operated approximately 35 furniture stores, including stand-alone bedding stores, under the "Levin Furniture" name in Pennsylvania and Ohio.

146.    At the time of the Levin closing, Debtor Sam Levin owned one real property, described as 606 Main Street, Mt. Pleasant, Pennsylvania (the "Sam Levin Property").

147.    Also, effective as of November 22, 2017, the Debtors, through a newly formed entity call Wolf Parent LLC, entered into that certain Asset Purchase Agreement to acquire the assets of the Wolf Furniture business ("Wolf") and certain related real properties for approximately $60,084,000 (the "Wolf Acquisition").

148.    Wolf operated approximately 18 furniture stores under the "Wolf Furniture" name in Pennsylvania, Maryland, and Virginia.

149.    Yost signed the Levin Stock Purchase Agreement and the Wolf Asset Purchase Agreement on behalf of the respective buyers.

150.    Because the Debtors already were overleveraged as a result of the Art Van Acquisition a few months earlier, the Debtors did not have sufficient capital to fund the acquisitions of Levin and Wolf.

151.    Instead, according to the audited consolidated financial statements of Holdco and its subsidiaries for the fiscal year ended September 30, 2018 (the "2018 Financial Statements"), the Levin Acquisition and the Wolf Acquisitions were funded by the following:

    a.    $128,899,000 in proceeds from certain sale-leaseback transactions involving the Levin real properties, the Sam Levin Property, and the Wolf real properties;

    b.    $80,00,000 in additional term loan debt;

    c.    $13,000,000 in additional debt under the revolving line of credit; and

    d.    $12,200,000 in cash.

152.    The Debtors also incurred more than $10.4 million in fees and expenses relating to the Levin Acquisition and the Wolf Acquisition.  These included prepaid rent and prepaid fees of $1,721,000, sale leaseback fees of $2,946,000, professional fees of $4,132,000 and financing fees of $1,463,000, according to the 2018 Financial Statements.

153.    Upon information and belief, the Levin Acquisition and the Wolf Acquisition were approved by, among others, Gary and Yost.

154.    Shortly after the Levin Acquisition and the Wolf Acquisition closed, in or about December 2017, the Debtors sold the Comfort business.

**G.      The Debtors Collapse into Bankruptcy.**

155.     The 2018 Financial Statements reflect that, after the Levin Acquisition and the Wolf Acquisition, the Debtors' already massive funded debt obligations grew to more than $305 million, up from approximately $253 million at the end of the 2017 fiscal year.

156.     Notably, the total funded debt reflected in the 2018 Financial Statements is actually net of an approximately $15 million reduction to the shareholder note debt, which had been converted to common stock around the time of the Levin Acquisition and the Wolf Acquisition.

157.     It is also notable that the average weighted borrowing rate for the Debtors' term loan debt had reached 9.1%, according to the 2018 Financial Statements.

158.     In fiscal year 2018, the Debtors recorded approximately $24,000,000 in interest expenses relating to funded debt, up from $10,382,000 for the last seven months of fiscal year 2017.  As a result of the Levin Acquisition and the Wolf Acquisition, the Debtors were obligated to pay millions of dollars per year in additional interest expenses.

159.     The 2018 Financial Statements also reflect that, after the Levin Acquisition and the Wolf Acquisition, the Debtors' total future operating lease obligations had grown to more than $1,239,000,000, up from approximately $877 million at the end of the 2017 fiscal year, an increase of approximately $362,000,000.

160.     Further, the 2018 Financial Statements reflect minimum operating lease payments for the next year of $72,658,000, up from approximately $45.5 million in fiscal year 2017.  As a result of the Levin Acquisition and the Wolf Acquisition, the Debtors' minimum lease obligations increased by approximately $27 million per year.

161.     The Debtors' finished fiscal year 2018 with a net loss of $70,765,000 and negative stockholder equity of $6,919,000, according to the 2018 Financial Statements.

162.     On or about September 30, 2019, the board authorized and approved the merger of AVASI and its subsidiary into Art Van.   The Agreement and Plan of Merger provides, among other things, that Art Van shall be the surviving company and that "all of the rights, privileges, powers, franchise, properties and assets of AVASI" shall be vested in Art Van.

163.     By the end of the 2019 fiscal year, the Debtors were unable to obtain a going concern opinion from their auditor.

164.     According to the draft consolidated financial statements of Holdco and its subsidiaries for the fiscal year ended September 30, 2019, the Debtors had suffered a further net loss of $95,752,000 and had negative stockholder equity of $102,833,000.

165.     In total, from March 1, 2017 to September 30, 2019, the Debtors lost nearly **$189 million**, as a result of the highly leveraged Art Van Acquisition, compounded by the ill-conceived Levin Acquisition and Wolf Acquisition.

166.     Despite the foregoing, during the period from March 1, 2017 through September 30, 2019, the board caused the Debtors to pay at least $7,358,000 in management and other fees, including without limitation, (i) a "sponsor fee" of at least $4,500,000 in connection with the Art Van Acquisition; (ii) at least $440,000 in "management fees" during fiscal year 2017; (iii) at least $538,000 in "expense reimbursements" in fiscal year 2017; (iv) at least $750,000 in "management fees" during fiscal year 2018; (v) at least $109,000 in "expense reimbursements" in fiscal year 2018; and (vi) at least $1,021,000 in "management fees" and "expense reimbursements" for fiscal year 2019 (collectively, the "Management Fees").

167.     In November 2019, the Debtors amended their revolving line of credit to increase the facility from $60 million to $82.5 million.

168.     In December 2019, the Debtors amended their term loan credit facility to suspend cash interest payments.

169.     In or about January 2020, the Debtors went into forbearance on their revolving line of credit.

170.     The Debtors made a series of last-ditched attempts to obtain rescue financing or to find a buyer.

171.     According to the Declaration of David Ladd filed in support of the Debtors' bankruptcy petitions and so-called "first day motions," the "most likely and promising alternative that emerged was an out-of-court recapitalization transaction involving a consortium of investors" including the Van Elslander family, among others.  Unfortunately, due to a combination of factors, including the impact of the coronavirus on equity markets during the week of February 24, 2020 and the willingness of the consortium members to contribute capital, this effort failed.

172.     On or about February 28, 2020, the Debtors' forbearance ended without extension.

173.     The Debtors quickly pivoted to going-out-of-business sales to liquidate their inventory and wind down operations.

174.     On or about March 5, 2020, media reports surfaced that the Debtors were liquidating their stores and laying off employees.

175.     On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

176.     Less than one month later, the Debtors' chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code and the Chapter 7 Trustee was appointed as Trustee of the Debtors' estates.

177.    Upon information and belief, as of the Petition Date, the Debtors' unsecured creditors were owed hundreds of millions of dollars in unpaid claims.

178.    As of the date of the Art Van Acquisition, the date of each Avoidable Transfer, the date of each Breach of Duty and as of the Petition Date, the Debtors had numerous unsecured creditors holding allowable claims that would have standing to bring claims against Defendants. Such creditors include, without limitation, Fusion Furniture, Inc., Fredman Bros. Furniture Co. dba Glideaway Bed Carriage Manufacturing Company, Kingdown, Inc., Serta Restokraft Mattress Co., Southern Motion, Inc., and Tempur Sealy International, Inc. and subsidiaries, among others. In addition to the foregoing, as of the date of the Levin Acquisition, Wolf Acquisition and the related Breaches of Duty and as of the Petition Date, the Debtors had numerous unsecured creditors holding allowable claims that would have standing to bring claims against Defendants, including, without limitation, England Furniture, Inc., Flexsteel Industries Inc., Magnussen Home Furnishings, Inc., Modern of Marshfield Inc. dba Marshfield Furniture, and Serta Simmons Bedding, LLC, among others.

**H.    Defendants Failed to Disclose the Avoidable Transfers and the Breaches of Duty.**

179.    Upon information and belief, the Debtors' unsecured creditors did not know and could not have known about the Avoidable Transfers to or for the benefit of Defendants when such Avoidable Transfers were made or the Breaches of Duty when they were committed by the Fiduciary Defendants.

180.    Indeed, the Debtors' unsecured creditors would have had no reason to know about the Avoidable Transfers and the Breaches of Duty.  The Debtors were privately held companies and, upon information and belief, their financial statements and other corporate documents were not publicly available.  Moreover, upon information and belief, the 2017 Financial Statements were not completed until on or about May 7, 2018.  Thus, even if an unsecured creditor would

somehow have obtained a copy of the 2017 Financial Statements, and somehow deduced from those financial statements the existence of claims relating to the Avoidable Transfers and the Breaches of Duty, the time to bring such claims would not have run as of the Petition Date.

181.    Upon information and belief, the Fiduciary Defendants, despite owing fiduciary duties to, among others, Art Van, Comfort and AVASI, did not disclose the Avoidable Transfers or the Breaches of Duty, to the detriment of the Debtors' unsecured creditors.

182.    In fact, the Fiduciary Defendants, acting on their own behalf and on behalf of or for the benefit of some or all of the other Defendants, engaged in one or more affirmative acts that concealed the Avoidable Transfers and the Breaches of Duty.  Such affirmative acts included, without limitation, the transfers of ownership of certain real properties shortly before or immediately after the Closing Date; the transfers of equity ownership of certain Debtors shortly before the Closing Date; the conversions of certain entities from Michigan corporations to Delaware limited liability companies on the eve of the Closing Date; and the use of sale-leaseback transactions and funded debt to strip value out of the Company; among other things.  And, notably, after the Closing Date, both Gary and Yost remained on the board.

I.    **The Art Van Acquisition and Stripping of Value from Art Van and Comfort was Part of One Integrated Transaction and Should be Collapsed.**

183.    The Art Van Acquisition and the corresponding Avoidable Transfers to Defendants would not have been possible without the combination of the sale-leaseback transactions, excessive borrowing and Breaches of Duty, among other things, which were part of one integrated transaction.

184.    All of the parties involved in these transactions knew about the multiple transactions.  Among other things:

a.      Defendants or their representatives knew about the sale-leaseback transactions and knew the Buyer had an equity commitment for just a fraction of the total purchase price;

b.      the Buyer knew about the multiple transactions, as it was a party to and executed the Purchase Agreement, the Sale-Leaseback Agreements, and Credit Agreements, among other things;

c.      the Sale-Leaseback Agreements demonstrate the Landlords knew about the other transactions, including the sale of the Company; and

d.      the Credit Agreements demonstrate the lenders knew about the Art Van Acquisition and the sale-leaseback transactions.

185.    None of the above-described transactions would have occurred on its own.  Among other things:

a.      the VE Defendants would not have sold the Company to the Buyer without payment of the purchase price, which the VE Defendants knew or should have known would be financed overwhelmingly from the sale-leaseback transactions and funded debt;

b.      the Buyer, a newly formed entity with no assets, could not have acquired the Company without the sale-leaseback transactions and the funded debt;

c.      the Landlords could not have acquired title to the Properties and the other real properties from the Buyer without the closing of the Art Van Acquisition, which was funded both by the sale-leaseback transactions and the funded debt; and

d.      the lenders would not have made the loans to the Buyer unless the Art Van Acquisition closed.

186.    Each of these transactions is dependent or conditioned upon the other transactions.  Among other things:

a.      the Purchase Agreement required the Buyer to pay Defendants more than $600 million, which the Buyer did not have absent the Sale-Leaseback Agreements and the Credit Agreements becoming effective;

b.      each of the Sale-Leaseback Agreements is expressly conditioned upon, among other things, the closing of the Art Van Acquisition; and

c.      the Credit Agreements were conditioned on, among other things, the Purchase Agreement.  Notably, the Credit Agreements specifically contemplate and permit the sale-leasebacks to the Landlords.

187.     Similarly, the amendments to Gary's, David's, and Yost's employment agreements with Art Van, which obligated Art Van to pay them multi-million dollar Avoidable Transfers, were conditioned on the Art Van Acquisition closing.

188.     And the Fiduciary Defendants, whose Breaches of Duty enabled the Art Van Acquisition and the corresponding Avoidable Transfers to themselves and the other Defendants, as directors, officers, were signatories to many of the operative documents and/or they knew about, or should have known about, the transactions described above.

### FIRST COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS
### (ART VAN PROPERTY TRANSFERS)
### Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including
### Without Limitation M.C.L.A. § 566.34; 6 Del. Code § 1304
### <u>Against the VE Defendants</u>

189.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

190.     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation, among other things, without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

191.     Within four years prior to the Petition Date, Debtor Art Van made one or more transfers to or for the benefit of the VE Defendants, including without limitation, transferring on

or about March 1, 2017 at least $84,700,000 in value in the Art Van Properties (collectively, the "Art Van Property Transfers").

192.    The Art Van Properties Transfers were transfers of an interest of Art Van in property.

193.    Art Van did not receive a reasonably equivalent value in exchange for any of the Art Van Property Transfers.  In fact, Art Van received nothing for the Art Van Property Transfers. There was at least $84.7 million in value in the Art Van Properties that belonged to Art Van.  Art Van received none of the purchase price paid for the Art Van Properties.  Instead, that purchase price was transferred to or for the benefit of the VE Defendants.

194.    The Debtors were left with just $2 million in cash as of the Closing Date, which clearly is not a reasonably equivalent value for the more than $84,700,000 in value that was stripped out of Art Van by the VE Defendants.

195.    Each of the Art Van Property Transfers was made at a time when Art Van was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to such business or transaction.

196.    Each of the Art Van Property Transfers was made at a time when Art Van intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as such debts as they became due.

197.    As set forth in detail above, and without limitation, at the time of or as a result of the Art Van Property Transfers:

      a.    Art Van was stripped of at least $84.7 million in value.

      b.    Art Van was liable for $254 million in funded debt, compared with $0 in funded debt prior to the Art Van Property Transfers.

      c.    Art Van was liable for $10.4 million or more per year in new interest expenses, compared with $0 prior to the Art Van Property Transfers.

d.     Art Van and/or the other Debtors were liable for $877 million in total future lease obligations, compared with $136.5 million prior to the Art Van Property Transfers.

e.     Art Van and/or the other Debtors were liable for nearly $46 million per year in lease obligations, compared with less than $23 per year prior to the Art Van Property Transfers.

f.     The entire profitability of Art Van and the other Debtors had been wiped out.

g.     The assets of Art Van and the other Debtors were greatly diminished. Their remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

h.     Art Van and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

198.    If Art Van had been liquidated immediately after the Art Van Property Transfers had been made, Art Van's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

199.    Because the Art Van Property Transfers rendered Art Van unable to pay its debts as they became due, the Art Van Property Transfers were not lawful distributions or dividends.

200.    None of the VE Defendants received any of the Art Van Property Transfers in good faith or for a reasonably equivalent value.

201.    As set forth above, at the time of each Art Van Property Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the Art Van Property Transfers.

202.    Accordingly, the Art Van Property Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.34, *et seq.*; 6 Del. Code § 1304, *et seq.*

203.    The Trustee seeks a judgment against each of the VE Defendants in an amount to be determined at trial.

**SECOND COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(ART VAN PROPERTY TRANSFERS)**
**Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including**
**Without Limitation M.C.L.A. § 566.35; 6 Del. Code § 1305**
**Against the VE Defendants**

204.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

205.    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

206.    Within four years prior to the Petition Date, Debtor Art Van made one or more transfers to or for the benefit of the VE Defendants, including without limitation, the Art Van Property Transfers.

207.    The Art Van Properties Transfers were transfers of an interest of Art Van in property.

208.    Art Van did not receive a reasonably equivalent value in exchange for any of the Art Van Property Transfers.  In fact, Art Van received nothing for the Art Van Property Transfers.  There was at least $84.7 million in value in the Art Van Properties that belonged to Art Van.  Art

Van received none of the purchase price paid for the Art Van Properties.  Instead, that purchase price was transfers to or for the benefit of the VE Defendants.

209.    The Debtors were left with just $2 million in cash as of the Closing Date, which clearly is not a reasonably equivalent value for the more than $84,700,000 in value that was stripped out of Art Van by the VE Defendants.

210.    Art Van became insolvent as a result of the Art Van Property Transfers.

211.    As set forth in detail above, and without limitation, as a result of the Art Van Property Transfers:

    a.    Art Van was stripped of at least $84.7 million in value.

    b.    Art Van was liable for $254 million in funded debt, compared with $0 in funded debt prior to the Art Van Property Transfers.

    c.    Art Van was liable for $10.4 million or more per year in new interest expenses, compared with $0 prior to the Art Van Property Transfers.

    d.    Art Van and/or the other Debtors were liable for $877 million in total future lease obligations, compared with $136.5 million prior to the Art Van Property Transfers.

    e.    Art Van and/or the other Debtors were liable for nearly $46 million per year in lease obligations, compared with less than $23 million per year prior to the Art Van Property Transfers.

    f.    The entire profitability of Art Van and the other Debtors had been wiped out.

    g.    The assets of Art Van and the other Debtors were greatly diminished.  Their remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

    h.    Art Van and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

212.    If Art Van had been liquidated immediately after the Art Van Property Transfers had been made, Art Van's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

213.    Because the Art Van Property Transfers rendered Art Van insolvent, the Art Van Property Transfers were not lawful distributions or dividends.

214.    None of the VE Defendants received any of the Art Van Property Transfers in good faith or for a reasonably equivalent value.

215.    As set forth above, at the time of each Art Van Property Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the Art Van Property Transfers.

216.    Accordingly, the Art Van Property Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.35, *et seq.*; 6 Del. Code § 1305, *et seq.*

217.    The Trustee seeks a judgment against each of the VE Defendants in an amount to be determined at trial.

### THIRD COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS
### (COMFORT PROPERTY TRANSFERS)
### Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including
### Without Limitation M.C.L.A. § 566.34; 6 Del. Code § 1304
### <u>Against the VE Defendants</u>

218.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

219.    Within four years prior to the Petition Date, Debtor Comfort made one or more transfers to or for the benefit of the VE Defendants, including without limitation, transferring on

or about March 1, 2017 approximately $3,000,000 in value in the Comfort Property (collectively, the "Comfort Property Transfers").

220.    The Comfort Properties Transfers were transfers of an interest of Comfort in property.

221.    Comfort did not receive a reasonably equivalent value in exchange for any of the Comfort Property Transfers.  In fact, Comfort received nothing for the Comfort Property Transfers. There was approximately $3,000,000 in value in the Comfort Property that belonged to Comfort. Comfort received none of the purchase price paid for the Comfort Property.  Instead, that purchase price was transferred to or for the benefit of the VE Defendants.

222.    Each of the Comfort Property Transfers was made at a time when Comfort was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to such business or transaction.

223.    Each of the Comfort Property Transfers was made at a time when Comfort intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as such debts as they became due.

224.    As set forth in detail above, and without limitation, at the time of or as a result of the Comfort Property Transfers:

    a.    Comfort was stripped of at least $3,000,000 in value.  In particular, Comfort received just $1 for the transfer of title to the Comfort Property to Defendant VEV.

    b.    Comfort was liable for $254 million in funded debt, compared with $0 prior to the Comfort Property Transfers.

    c.    Comfort was liable for $10.4 million or more per year in new interest expenses, compared with $0 prior to the Comfort Property Transfers.

    d.    The entire profitability of Comfort and the other Debtors had been wiped out.

    e.      The assets of Comfort and the other Debtors were greatly diminished. These remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

    f.      Comfort and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

225.    If Comfort had been liquidated immediately after the Comfort Property Transfers had been made, Comfort's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

226.    Because the Comfort Property Transfers rendered Comfort unable to pay its debts as they became due, the Comfort Property Transfers were not lawful distributions or dividends.

227.    None of the VE Defendants received any of the Comfort Property Transfers in good faith or for a reasonably equivalent value.

228.    As set forth above, at the time of each Comfort Property Transfer and as of the Petition Date, Comfort had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the Comfort Property Transfers.

229.    Accordingly, the Comfort Property Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.34, *et seq.*; 6 Del. Code § 1304, *et seq.*

230.    The Trustee seeks a judgment against each of the VE Defendants in an amount to be determined at trial.

## FOURTH COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS
### (COMFORT PROPERTY TRANSFERS)
### Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including
### Without Limitation M.C.L.A. § 566.35; 6 Del. Code § 1305
### Against the VE Defendants

231.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

232.    Within four years prior to the Petition Date, Debtor Comfort made one or more transfers to or for the benefit of the VE Defendants, including without limitation, the Comfort Van Property Transfers.

233.    The Comfort Properties Transfers were transfers of an interest of Comfort in property.

234.    Comfort did not receive a reasonably equivalent value in exchange for any of the Comfort Property Transfers. In fact, Comfort received nothing for the Comfort Property Transfers. There was approximately $3,000,000 in value in the Comfort Properties that belonged to Comfort. Comfort received none of the purchase price paid for the Comfort Properties. Instead, that purchase price was transferred to or for the benefit of the VE Defendants.

235.    Comfort became insolvent as a result of the Comfort Property Transfers.

236.    As set forth in detail above, and without limitation, as a result of the Comfort Property Transfers:

  a.    Comfort was stripped of at least $3,000,000 in value. In particular, Comfort received just $1 for the transfer of title to the Comfort Property to Defendant VEV.

  b.    Comfort was liable for $254 million in funded debt, compared with $0 prior to the Comfort Property Transfers.

  c.    Comfort was liable for $10.4 million or more per year in new interest expenses, compared with $0 prior to the Comfort Property Transfers.

d.    The entire profitability of Comfort and the other Debtors had been wiped out.

e.    The assets of Comfort and the other Debtors were greatly diminished. These remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

f.    Comfort and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

237.    If Comfort had been liquidated immediately after the Comfort Property Transfers had been made, Comfort's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

238.    Because the Comfort Property Transfers rendered Comfort insolvent, the Comfort Property Transfers were not lawful distributions or dividends.

239.    None of the VE Defendants received any of the Comfort Property Transfers in good faith or for a reasonably equivalent value.

240.    As set forth above, at the time of each Comfort Property Transfer and as of the Petition Date, Comfort had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the Comfort Property Transfers.

241.    Accordingly, the Comfort Property Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.35, *et seq.*; 6 Del. Code § 1305, *et seq.*

242.    The Trustee seeks a judgment against each of the VE Defendants in an amount to be determined at trial.

**FIFTH COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(GVE BONUS TRANSFERS)**
**Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including**
**Without Limitation M.C.L.A. § 566.34; 6 Del. Code § 1304**
**Against Defendant Gary A. Van Elslander**

243.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

244.    Within four years prior to the Petition Date, Debtor Art Van made one or more transfers to or for the benefit of Gary A. Van Elslander, including without limitation, on or about March 1, 2017, a "success fee" of at least $8,000,000 (collectively, the "GVE Bonus Transfers").

245.    The GVE Bonus Transfers were transfers of an interest of Art Van in property.

246.    Art Van did not receive a reasonably equivalent value in exchange for any of the GVE Bonus Transfers.  In fact, Art Van received nothing for the GVE Bonus Transfers.  Among other things, Gary was already obligated under his existing employment agreements to render services to Art Van.

247.    The amendment to Gary's employment agreement that provided for the GVE Bonus Transfers was executed in mid-January 2017, after the Purchase Agreement had already been negotiated and was in substantially final form.  Any services rendered in connection with the marketing and sale of Art Van's business had already been substantially provided.

248.    Moreover, the GVE Bonus Transfers to Gary were materially larger than the bonuses, success fees, or other transfers made to certain other Art Van executives.  Unlike the GVE Bonus Transfers, many of the payments to other executives were conditioned on those executives remaining in the Debtors' employment for 18 months or longer.

249.    The GVE Bonus Transfers were not made in the ordinary course of business.  Rather, the GVE Bonus Transfers were payable upon the closing of a sale of the entire Company.

250.     The amendments to Gary's employment agreement that provided for the GVE Bonus Transfers were **not** arm's length.  Yost signed Gary's amendment on behalf of Art Van; Gary signed Yost's amendment on behalf of Art Van; and Yost signed David's amendment on behalf of Art Van.

251.     Each of the GVE Bonus Transfers was made at a time when Art Van was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to such business or transaction.

252.     Each of the GVE Bonus Transfers was made at a time when Art Van intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as such debts as they became due.

253.     As set forth in detail above, and without limitation, when the GVE Bonus Transfers were made:

  a.     Art Van was stripped of at least $84.7 million in value.

  b.     Art Van was liable for $254 million in funded debt, compared with $0 prior to the Art Van Property Transfers.

  c.     Art Van was liable for $10.4 million or more in new interest expenses per year, compared with $0 prior to the Art Van Property Transfers.

  d.     Art Van and/or the other Debtors were liable for $877 million in total future lease obligations, compared with $136.5 million prior to the Art Van Property Transfers.

  e.     Art Van and/or the other Debtors were liable for nearly $46 million per year in lease obligations per year, compared with less than $23 million per year prior to the Art Van Property Transfers.

  f.     The entire profitability of Art Van and the other Debtors had been wiped out.

  g.     The assets of Art Van and the other Debtors were greatly diminished.  These remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

h.  Art Van and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

254.  If Art Van had been liquidated immediately after the GVE Bonus Transfers had been made, Art Van's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

255.  Because Art Van was unable to pay its debts as they became due, the GVE Bonus Transfers were not lawful distributions or dividends.

256.  Gary did not receive any of the GVE Bonus Transfers in good faith or for a reasonably equivalent value.

257.  As set forth above, at the time of each GVE Bonus Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the GVE Bonus Transfers.

258.  Accordingly, the GVE Bonus Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.34, *et seq.*; 6 Del. Code § 1304, *et seq.*

259.  The Trustee seeks a judgment against Gary in an amount of not less than $8,000,000.

**SIXTH COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(GVE BONUS TRANSFERS)**
**Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including**
**Without Limitation M.C.L.A. § 566.35; 6 Del. Code § 1305**
**<u>Against Defendant Gary A. Van Elslander</u>**

260.  The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

261.     Within four years prior to the Petition Date, Debtor Art Van made one or more transfers to or for the benefit of Gary, including without limitation the GVE Bonus Transfers.

262.     The GVE Bonus Transfers were transfers of an interest of Art Van in property.

263.     Art Van did not receive a reasonably equivalent value in exchange for any of the GVE Bonus Transfers.  In fact, Art Van received nothing for the GVE Bonus Transfers.  Among other things, Gary was already obligated under his existing employment agreements to render services to Art Van.

264.     The amendment to Gary's employment agreement that provided for the GVE Bonus Transfers was executed in mid-January 2017, after the Purchase Agreement had already been negotiated and was in substantially final form.  Any services rendered in connection with the marketing and sale of Art Van's business had already been substantially provided.

265.     Moreover, the GVE Bonus Transfers to Gary were materially larger than the bonuses, success fees, or other transfers made to other Art Van executives.  Unlike the GVE Bonus Transfers, many of the payments to other executives were conditioned on those executives remaining in the Debtors' employment for 18 months or longer.

266.     The GVE Bonus Transfers were not made in the ordinary course of business.  Rather, the GVE Bonus Transfers were payable upon the closing of a sale of the entire Company.

267.     The amendments to Gary's employment agreement that provided for the GVE Bonus Transfers were **not** arm's length.  Yost signed Gary's amendment on behalf of Art Van; Gary signed Yost's amendment on behalf of Art Van; and Yost signed David's amendment on behalf of Art Van.

268.     Art Van was insolvent at the time or became insolvent as a result of the GVE Bonus Transfers.

269.    As set forth in detail above, and without limitation, at the time when the GVE Bonus Transfers were made:

    a.    Art Van was stripped of at least $84.7 million in value.

    b.    Art Van was liable for $254 million in funded debt, compared with $0 prior to the Art Van Property Transfers.

    c.    Art Van was liable for $10.4 million or more in new interest expenses per year, compared with $0 prior to the Art Van Property Transfers.

    d.    Art Van and/or the other Debtors were liable for $877 million in total future lease obligations, compared with $136.5 million prior to the Art Van Property Transfers.

    e.    Art Van and/or the other Debtors were liable for nearly $46 million per year in lease obligations per year, compared with less than $23 million per year prior to the Art Van Property Transfers.

    f.    The entire profitability of Art Van and the other Debtors had been wiped out.

    g.    The assets of Art Van and the other Debtors were greatly diminished.  These remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

    h.    Art Van and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

270.    If Art Van had been liquidated immediately after the GVE Bonus Transfers had been made, Art Van's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

271.    Because the GVE Transfers were made at a time when Art Van was insolvent or rendered Art Van insolvent, the GVE Bonus Transfers were not lawful distributions or dividends.

272.    Gary did not receive any of the GVE Bonus Transfers in good faith or for a reasonably equivalent value.

273.    As set forth above, at the time of each GVE Bonus Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the GVE Bonus Transfers.

274.    Accordingly, the GVE Bonus Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.35, *et seq.*; 6 Del. Code § 1305, *et seq.*

275.    The Trustee seeks a judgment against Gary in an amount of not less than $8,000,000.

### SEVENTH COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS (DVE BONUS TRANSFERS)
#### Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including Without Limitation M.C.L.A. § 566.34; 6 Del. Code § 1304
#### Against Defendant David P. Van Elslander

276.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

277.    Within four years prior to the Petition Date, Debtor Art Van made one or more transfers to or for the benefit of David P. Van Elslander, including without limitation, on or about March 1, 2017, at least $2,515,820 in success fees, bonuses or other transfers (collectively, the "DVE Bonus Transfers").

278.    The DVE Bonus Transfers were transfers of an interest of Art Van in property.

279.    Art Van did not receive a reasonably equivalent value in exchange for any of the DVE Bonus Transfers.  In fact, Art Van received nothing for the DVE Bonus Transfers.  Among other things, David already were obligated under his existing employment agreements to render services to Art Van.

280.    The amendment to David's employment agreement that provided for the DVE Bonus Transfers was executed in mid-January 2017, after the Purchase Agreement had already been negotiated and was in substantially final form.  Any services rendered in connection with the marketing and sale of Art Van's business had already been substantially provided.

281.    Moreover, the DVE Bonus Transfers to David were materially larger than the bonuses, success fees, or other transfers made to certain other Art Van executives.  Unlike the DVE Bonus Transfers, many of the payments to other executives were conditioned on those executives remaining in the Debtors' employment for 18 months or longer.

282.    The DVE Bonus Transfers were not made in the ordinary course of business.  Rather, the DVE Bonus Transfers were payable upon the closing of a sale of the entire Company.

283.    The amendments to David's employment agreement that provided for the DVE Bonus Transfers were **not** arm's length.  Yost signed David's amendment on behalf of Art Van; David signed Yost's amendment on behalf of Art Van; and Yost signed David's amendment on behalf of Art Van.

284.    Each of the DVE Bonus Transfers was made at a time when Art Van was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to such business or transaction.

285.    Each of the DVE Bonus Transfers was made at a time when Art Van intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as such debts as they became due.

286.    As set forth in detail above, and without limitation, when the DVE Bonus Transfers were made:

    a.    Art Van was stripped of at least $84.7 million in value.

b.  Art Van was liable for $254 million in funded debt, compared with $0 prior to the Art Van Property Transfers.

c.  Art Van was liable for $10.4 million or more in new interest expenses per year, compared with $0 prior to the Art Van Property Transfers.

d.  Art Van and/or the other Debtors were liable for $877 million in total future lease obligations, compared with $136.5 million prior to the Art Van Property Transfers.

e.  Art Van and/or the other Debtors were liable for nearly $46 million per year in lease obligations per year, compared with less than $23 million per year prior to the Art Van Property Transfers.

f.  The entire profitability of Art Van and the other Debtors had been wiped out.

g.  The assets of Art Van and the other Debtors were greatly diminished.  These remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

h.  Art Van and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

287.  If Art Van had been liquidated immediately after the DVE Bonus Transfers had been made, Art Van's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

288.  Because Art Van was unable to pay its debts as they became due, the DVE Bonus Transfers were not lawful distributions or dividends.

289.  David did not receive any of the DVE Bonus Transfers in good faith or for a reasonably equivalent value.

290.     As set forth above, at the time of each DVE Bonus Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the DVE Bonus Transfers.

291.     Accordingly, the DVE Bonus Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.34, *et seq.*; 6 Del. Code § 1304, *et seq.*

292.     The Trustee seeks a judgment against David in an amount of not less than $2,515,820.

### EIGHTH COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS (DVE BONUS TRANSFERS) Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including Without Limitation M.C.L.A. § 566.35; 6 Del. Code § 1305 Against Defendant David P. Van Elslander

293.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

294.     Within four years prior to the Petition Date, Debtor Art Van made one or more transfers to or for the benefit of David, including without limitation the DVE Bonus Transfers.

295.     The DVE Bonus Transfers were transfers of an interest of Art Van in property.

296.     Art Van did not receive a reasonably equivalent value in exchange for any of the DVE Bonus Transfers.  In fact, Art Van received nothing for the DVE Bonus Transfers.  Among other things, David already were obligated under his existing employment agreements to render services to Art Van.

297.     The amendment to David's employment agreement that provided for the DVE Bonus Transfers was executed in mid-January 2017, after the Purchase Agreement had already

been negotiated and was in substantially final form.  Any services rendered in connection with the marketing and sale of Art Van's business had already been substantially provided.

298.    Moreover, the DVE Bonus Transfers to David were materially larger than the bonuses, success fees, or other transfers made to certain other Art Van executives.  Unlike the DVE Bonus Transfers, many of the payments to other executives were conditioned on those executives remaining in the Debtors' employment for 18 months or longer.

299.    The DVE Bonus Transfers were not made in the ordinary course of business.  Rather, the DVE Bonus Transfers were payable upon the closing of a sale of the entire Company.

300.    The amendments to David's employment agreement that provided for the DVE Bonus Transfers were **not** arm's length.  Yost signed David's amendment on behalf of Art Van; David signed Yost's amendment on behalf of Art Van; and Yost signed David's amendment on behalf of Art Van.

301.    Art Van was insolvent at the time or became insolvent as a result of the DVE Bonus Transfers.

302.    As set forth in detail above, and without limitation, at the time when the DVE Bonus Transfers were made:

      a.    Art Van was stripped of at least $84.7 million in value.

      b.    Art Van was liable for $254 million in funded debt, compared with $0 prior to the Art Van Property Transfers.

      c.    Art Van was liable for $10.4 million or more in new interest expenses per year, compared with $0 prior to the Art Van Property Transfers.

      d.    Art Van and/or the other Debtors were liable for $877 million in total future lease obligations, compared with $136.5 million prior to the Art Van Property Transfers.

      e.    Art Van and/or the other Debtors were liable for nearly $46 million per year in lease obligations per year, compared with less than $23 million per year prior to the Art Van Property Transfers.

f.    The entire profitability of Art Van and the other Debtors had been wiped out.

g.    The assets of Art Van and the other Debtors were greatly diminished. These remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

h.    Art Van and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

303.    If Art Van had been liquidated immediately after the DVE Bonus Transfers had been made, Art Van's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

304.    If Art Van had been liquidated the date after the DVE Van Property Transfers were made, Art Van's remaining assets, at a fair valuation. would not have been sufficient to pay all its outstanding debts.

305.    Because the DVE Transfers were made at a time when Art Van was insolvent or rendered Art Van insolvent, the DVE Bonus Transfers were not lawful distributions or dividends.

306.    David did not receive any of the DVE Bonus Transfers in good faith or for a reasonably equivalent value.

307.    As set forth above, at the time of each DVE Bonus Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the DVE Bonus Transfers.

308.    Accordingly, the DVE Bonus Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.35, *et seq.*; 6 Del. Code § 1305, *et seq.*

309.    The Trustee seeks a judgment against David in an amount of not less than $2,515,820.

**NINTH COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(YOST BONUS TRANSFERS)**
**Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including**
**Without Limitation M.C.L.A. § 566.34; 6 Del. Code § 1304**
**Against Defendant Richard Kim Yost**

310.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

311.    Within four years prior to the Petition Date, Debtor Art Van made one or more transfers, including without limitation, at least $6,000,000 in success fees, bonuses or other transfers to or for the benefit of Richard Kim Yost on or about March 1, 2017 (collectively, the "Yost Bonus Transfers").

312.    The Yost Bonus Transfers were transfers of an interest of Art Van in property.

313.    Art Van did not receive a reasonably equivalent value in exchange for any of the Yost Bonus Transfers.  In fact, Art Van received nothing for the Yost Bonus Transfers.  Among other things, Yost already were obligated under his existing employment agreements to render services to Art Van.

314.    The amendment to Yost's employment agreement that provided for the Yost Bonus Transfers was executed in mid-January 2017, after the Purchase Agreement had already been negotiated and was in substantially final form.  Any services rendered in connection with the marketing and sale of Art Van's business had already been substantially provided.

315.    Moreover, the Yost Bonus Transfers to Yost were materially larger than the bonuses, success fees, or other transfers made to certain other Art Van executives.  Unlike the Yost

Bonus Transfers, many of the payments to other executives were conditioned on those executives remaining in the Debtors' employment for 18 months or longer.

316.     The Yost Bonus Transfers were not made in the ordinary course of business. Rather, the Yost Bonus Transfers were payable upon the closing of a sale of the entire Company.

317.     The amendments to Yost's employment agreement that provided for the Yost Bonus Transfers were **not** arm's length.  Yost signed David's amendment on behalf of Art Van; David signed Yost's amendment on behalf of Art Van; and Yost signed David's amendment on behalf of Art Van.

318.     Each of the Yost Bonus Transfers was made at a time when Art Van was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to such business or transaction.

319.     Each of the Yost Bonus Transfers was made at a time when Art Van intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as such debts as they became due.

320.     As set forth in detail above, and without limitation, when the Yost Bonus Transfers were made:

      a.     Art Van was stripped of at least $84.7 million in value.

      b.     Art Van was liable for $254 million in funded debt, compared with $0 prior to the Art Van Property Transfers.

      c.     Art Van was liable for $10.4 million or more in new interest expenses per year, compared with $0 prior to the Art Van Property Transfers.

      d.     Art Van and/or the other Debtors were liable for $877 million in total future lease obligations, compared with $136.5 million prior to the Art Van Property Transfers.

      e.     Art Van and/or the other Debtors were liable for nearly $46 million per year in lease obligations per year, compared with less than $23 million per year prior to the Art Van Property Transfers.

  f.  The entire profitability of Art Van and the other Debtors had been wiped out.

  g.  The assets of Art Van and the other Debtors were greatly diminished. These remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

  h.  Art Van and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

321. If Art Van had been liquidated immediately after the Yost Bonus Transfers had been made, Art Van's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

322. Because Art Van was unable to pay its debts as they became due, the Yost Bonus Transfers were not lawful distributions or dividends.

323. Yost did not receive any of the Yost Bonus Transfers in good faith or for a reasonably equivalent value.

324. As set forth above, at the time of each Yost Bonus Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the Yost Bonus Transfers.

325. Accordingly, the Yost Bonus Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.34, *et seq.*; 6 Del. Code § 1304, *et seq.*

326. The Trustee seeks a judgment against Yost in an amount of not less than $6,000,000.

**TENTH COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(YOST BONUS TRANSFERS)**
**Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including**
**Without Limitation M.C.L.A. § 566.35; 6 Del. Code § 1305**
**Against Defendant Richard Kim Yost**

327.   The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

328.   Within four years prior to the Petition Date, Debtor Art Van made one or more transfers to or for the benefit of Richard Kim Yost, including without limitation the Yost Bonus Transfers.

329.   The Yost Bonus Transfers were transfers of an interest of Art Van in property.

330.   Art Van did not receive a reasonably equivalent value in exchange for any of the Yost Bonus Transfers.  In fact, Art Van received nothing for the Yost Bonus Transfers.  Among other things, Yost already were obligated under his existing employment agreements to render services to Art Van.

331.   The amendment to Yost's employment agreement that provided for the Yost Bonus Transfers was executed in mid-January 2017, after the Purchase Agreement had already been negotiated and was in substantially final form.  Any services rendered in connection with the marketing and sale of Art Van's business had already been substantially provided.

332.   Moreover, the Yost Bonus Transfers to David were materially larger than the bonuses, success fees, or other transfers made to other Art Van executives.  Unlike the Yost Bonus Transfers, many of the payments to other executives were conditioned on those executives remaining in the Debtors' employment for 18 months or longer.

333.   The Yost Bonus Transfers were not made in the ordinary course of business.  Rather, the Yost Bonus Transfers were payable upon the closing of a sale of the entire Company.

334.    The amendments to Yost's employment agreement that provided for the Yost Bonus Transfers were **not** arm's length.  Yost signed David's amendment on behalf of Art Van; David signed Yost's amendment on behalf of Art Van; and Yost signed David's amendment on behalf of Art Van.

335.    Art Van was insolvent at the time or became insolvent as a result of the Yost Bonus Transfers.

336.    As set forth in detail above, and without limitation, at the time when the Yost Bonus Transfers were made:

    a.    Art Van was stripped of at least $84.7 million in value.

    b.    Art Van was liable for $254 million in funded debt, compared with $0 prior to the Art Van Property Transfers.

    c.    Art Van was liable for $10.4 million or more in new interest expenses per year, compared with $0 prior to the Art Van Property Transfers.

    d.    Art Van and/or the other Debtors were liable for $877 million in total future lease obligations, compared with $136.5 million prior to the Art Van Property Transfers.

    e.    Art Van and/or the other Debtors were liable for nearly $46 million per year in lease obligations per year, compared with less than $23 million per year prior to the Art Van Property Transfers.

    f.    The entire profitability of Art Van and the other Debtors had been wiped out.

    g.    The assets of Art Van and the other Debtors were greatly diminished.  These remaining assets included, among other things, inventory, leases (at significant rents), some cash and accounts receivable, "intangible assets" and "goodwill."

    h.    Art Van and the other Debtors lost nearly $22.5 million as of the end of fiscal year 2017 and lost at least $189 million in the two and a half year period between March 1, 2017 and September 30, 2019. Upon information and belief, the Debtors suffered substantial additional losses between the end of fiscal year 2019 and the Petition Date, approximately five months later.

337.    If Art Van had been liquidated immediately after the Yost Bonus Transfers had been made, Art Van's remaining assets, at a fair valuation, would not have been sufficient to pay all of its outstanding debts.

338.    If Art Van had been liquidated the date after the Yost Van Property Transfers were made, Art Van's remaining assets, at a fair valuation. would not have been sufficient to pay all its outstanding debts.

339.    Because the Yost Transfers were made at a time when Art Van was insolvent or rendered Art Van insolvent, the Yost Bonus Transfers were not lawful distributions or dividends.

340.    Yost did not receive any of the Yost Bonus Transfers in good faith or for a reasonably equivalent value.

341.    As set forth above, at the time of each Yost Bonus Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the Yost Bonus Transfers.

342.    Accordingly, the Yost Bonus Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation M.C.L.A. § 566.35, *et seq.*; 6 Del. Code § 1305, *et seq.*

343.    The Trustee seeks a judgment against Yost in an amount of not less than $6,000,000.

### ELEVENTH COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS
### (YOST 2018 TRANSFERS)
### Pursuant to 11 U.S.C. § 548(a)(1)(B)
### Against Defendant Richard Kim Yost

344.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

345.     Within two (2) years prior to the Petition Date, Debtor Art Van made one or more transfers, including without limitation, at least $1,000,000 in transfers to or for the benefit of Yost on or about June 28, 2018 (the "Yost 2018 Transfers").

346.     The Yost 2018 Transfers were a "transfer" within the definition of 11 U.S.C. § 101(54)(D) of an interest of Art Van in property.

347.     Art Van did not receive a reasonably equivalent value in exchange for the Yost 2018 Transfers.  In fact, Art Van received nothing for the Yost 2018 Transfers.  Upon information and belief, the Yost 2018 Transfers were made at or about the time Yost retired from the Debtors' employment.  Thus, any services by Yost had already been rendered.

348.     Art Van was insolvent on the date of the Yost 2018 Transfers or became insolvent as a result of the Yost 2018 Transfers.

349.     Each of the Yost 2018 Transfers was made at a time when Art Van was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to such business or transaction.

350.     Each of the Yost 2018 Transfers was made at a time when Art Van intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as such debts as they became due.

351.     As set forth in detail above, and without limitation, at the time when the Yost Bonus Transfers were made:

    a.     Art Van and the other Debtors had been stripped of the value in their owned real properties.

    b.     Art Van and the other Debtors were liable for $305 million in funded debt, including $24 million per year in interest expenses.

    c.     Art Van and the other Debtors were liable for more than **$1.2 billion** in total future lease obligations, including $72.7 million per year in minimum lease obligations.

      d.      The assets of Art Van and the other Debtors were greatly diminished.

      e.      Art Van and the other Debtors had already lost approximately $22.5 million in fiscal year 2017 and would lose an additional $70,765,000 in fiscal year 2018, which ended approximately three months after the Yost 2018 Transfers had been made.

352.    If Art Van had been liquidated immediately after the Yost 2018 Transfers had been made, Art Van's remaining assets, at a fair valuation. would not have been sufficient to pay all of its outstanding debts.

353.    Because the Yost 2018 Transfers were made at a time when Art Van was insolvent or rendered insolvent, the Yost 2018 Transfers were not lawful distributions or dividends.

354.    At the time of the Yost 2018 Transfers, Yost was an "insider" of Art Van within the definition of 11 U.S.C. § 101(31).

355.    The Yost 2018 Transfers were made to or for the benefit of Yost, an insider, under an employment contract and not in the ordinary course of business.

356.    Yost did not receive any of the Yost 2018 Transfers in good faith or for a reasonably equivalent value.

357.    As set forth above, at the time of each Yost 2018 Transfer and as of the Petition Date, Art Van had numerous unsecured creditors holding allowable claims that would have standing to bring claims to avoid and recover the Yost 2018 Transfers.

358.    Accordingly, the Yost 2018 Transfers constitute avoidable constructive fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

359.    The Trustee seeks a judgment against Yost in an amount of not less than $1,000,000.

**TWELFTH COUNT – BREACHES OF FIDUCIARY DUTY**
**(ART VAN ACQUISITION AND RELATED AVOIDABLE TRANSFERS)**
**Pursuant to 11 U.S.C. § 544 and Applicable State Law**
**Against Defendants Archie A. Van Elslander, Gary A. Van Elslander,**
**David P. Van Elslander, and Richard Kim Yost**

360.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

361.    Prior to and at the time of the Art Van Acquisition and the related Avoidable Transfers, Art was, among other things, a director of Art Van, Comfort, AVASI, and their affiliates (collectively, the "Companies").

362.    Prior to and at the time of the Art Van Acquisition and the related Avoidable Transfers, Gary was, among other things, a director of Art Van, an officer of Comfort, and a director of AVASI.

363.    Prior to and at the time of the Art Van Acquisition and the related Avoidable Transfers, David was, among other things, a director of the Companies.

364.    Prior to and at the time of the Art Van Acquisition, including without limitation from January 1, 2016 through on or about March 1, 2017, Yost was, among other things, an officer of Art Van and the other Companies.

365.    As directors and/or officers of the Companies, each of the Fiduciary Defendants owed the Companies fiduciary duties of care, loyalty and good faith.

366.    The duty of care requires fiduciaries to exercise the care of ordinarily prudent and diligent persons in like positions under similar circumstances and that the fiduciary's decision-making be informed and carefully considered.  The duty of care is breached where, among other things, a director has actual or constructive knowledge that his actions are inconsistent with his fiduciary duties.

367.     The duty of loyalty obligates corporate fiduciaries to commit themselves to the business of the corporation with the attitude of promoting the interests of the corporation and not themselves.  The duty of loyalty is breached, inter alia: (i) when fiduciaries fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (ii) when fiduciaries "abdicate" their responsibilities; (iii) when fiduciaries usurp a corporate opportunity and/or (iv) when fiduciaries fail to act in good faith.

368.     To discharge their fiduciary duties owed to the Companies, the Fiduciary Defendants were required, *inter alia*: (i) to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of the Companies, as applicable; (ii) to be and remain informed as to how the Companies, as applicable, were operating and, upon receiving notice or information of an imprudent, questionable, or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts, as well as satisfying all the standards of conduct set forth in applicable law, rules and regulations; and (iii) to ensure the Companies, as applicable, were operating in a sound manner.

369.     These fiduciary duties required each Fiduciary Defendant at all times to perform his duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances and to subordinate his own personal interests to the interests of the Companies and their stakeholders.

370.     Each Fiduciary Defendant breached his fiduciary duties to the Companies by knowingly acting in a manner inconsistent with his fiduciary duties.  As set forth in detail in this Complaint, each Fiduciary Defendant had actual or constructive knowledge that his conduct was legally improper and a breach of fiduciary duty.

371.    Each Fiduciary Defendant recklessly, knowingly, or with willful blindness disregarded his fiduciary duties and either failed to reasonably inform himself or was willfully blind to the fact that, at the time the Art Van Acquisition closed, the Companies were insolvent, the Companies' total liabilities were greater than their total assets at a fair value, and the Companies would not be able to pay their debts as the debts become due.

372.    In addition to the foregoing, Art breached his fiduciary duties to the Companies by, among other things, the following:

a.    Art negotiated, signed, and implemented the Purchase Agreement on behalf of each of the Companies, but for the sole benefit of himself and the other Defendants.

b.    Art knew the Properties would be leveraged using sale-leaseback transactions and that the Companies would be stripped of the value of their Properties, for the benefit of himself and the other Defendants.  In fact, Art, or someone acting at his direction or under his control, commissioned an appraisal report of the Properties for "potential sale leaseback purposes." Art signed the Purchase Agreement, which provided for the sale of the Debtors' Properties, among others, to the Buyer "or its designee" and which required the Companies to provide "any potential purchaser" of such properties with reasonable access and the right to inspect such properties and to provide certain information "reasonably necessary for any sale-leaseback financing."  In addition, Art signed documents stating he had "carefully reviewed" the closing statements under which the Properties were transferred to third party commercial landlords.

c.    Under the Purchase Agreement, Art was entitled to receive information regarding the Buyer's equity commitments and debt commitments. Art knew, consciously disregarded, or failed to investigate or be reasonably informed about whether the Companies could support the significant funded debt load and substantially increased lease obligations that were used to fund the Art Van Acquisition and the related Avoidable Transfers to Art and the other Defendants. Art also knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that the Art Van Acquisition was highly leveraged and extremely risky.  For example, the initial equity commitment letter provided for an equity commitment of $216 million, or about only one-third of the total purchase price.  Less than six weeks later, the equity contribution was slashed to just $70 million—around 11 %—while the remaining 89% of the purchase price would have to come from other sources, notably the sale-leaseback transactions and funded debt.

d.  In addition, Art knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that, as a result of the Art Van Acquisition and the related Avoidable Transfers, the Companies were insolvent and unable to pay their debts as they became due. Notably, the Companies business lost $22.5 million as of the 2017 fiscal year end, just seven months after the Closing Date, and the losses grew ever larger.

e.  Art caused the Companies to incur more than $24 million in fees and expense in connection with the Art Van Acquisition, for the benefit of himself and the other Defendants.

f.  Art ignored these and other red flags and had a strong financial incentive to do so. Art and the other VE Defendants, who are all close family members or entities affiliated with the VE Defendants, stood to gain more than $600 million from the Art Van Acquisition. In particular, Art's Trust stood to gain $529.3 million from the purchase price.

g.  Art executed the Written Consents on behalf of each of the Companies, thereby, purporting to authorize, approve, and ratify the disloyal or otherwise improper acts or omissions committed by himself and others.

h.  Art either approved or acquiesced in the amendments to Art Van's employment agreements with Gary, David, and Yost under which Art Van was obligated to pay multi-million Bonus Transfers for which Art Van received no value.

373.  In addition to the foregoing, Gary breached his fiduciary duties to the Companies by, among other things, the following:

a.  Gary negotiated, signed, and implemented the Purchase Agreement on behalf of the Companies, but for the sole benefit of himself and the other Defendants.

b.  Gary knew the Properties would be leveraged using sale-leaseback transactions and that the Companies would be stripped of the value of their Properties, for the benefit of himself and the other Defendants. In fact, Gary, or someone acting at his direction or under his control, commissioned an appraisal report of the Properties, which was addressed to Gary, for "potential sale leaseback purposes." Gary signed the Purchase Agreement, which provided for the sale of the Debtors' Properties, among others, to the Buyer "or its designee" and which required the Companies to provide "any potential purchaser" of such properties with reasonable access and the right to inspect such properties and to provide certain information "reasonably necessary for any sale-leaseback financing." In addition, Gary signed documents stating he had "carefully reviewed" the closing statements under which the Properties were transferred to third party commercial landlords.

c.      Under the Purchase Agreement, Gary was entitled to receive information regarding the Buyer's equity commitments and debt commitments. Gary knew, consciously disregarded, or failed to investigate or be reasonably informed about whether the Companies could support the significant funded debt load and substantially increased lease obligations that were used to fund the Art Van Acquisition and the related Avoidable Transfers to Gary and the other Defendants.

d.      Gary also knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that the Art Van Acquisition was highly leveraged and extremely risky. For example, the initial equity commitment letter provided for an equity commitment of $216 million, or about only one-third of the total purchase price. Less than six weeks later, the equity contribution was slashed to just $70 million—around 11 %—while the remaining 89% of the purchase price would have to come from other sources, notably the sale-leaseback transactions and funded debt.

e.      In addition, Gary knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that, as a result of the Art Van Acquisition and the related Avoidable Transfers, the Companies were insolvent and unable to pay their debts as they became due. Notably, the Companies business lost $22.5 million as of the 2017 fiscal year end, just seven months after the Closing Date, and the losses grew ever larger.

f.      Without prior authority from Art Van's board, Gary executed the deed transferring Art Van's Headquarters to an affiliate of the Landlord, even though Gary knew or should have known Art Van would receive none of the purchase price for the Headquarters and its other Properties, which were worth at least $84.7 million.

g.      With no authority from Comfort's board, Gary executed the deed transferring the Comfort Property to Defendant VEV, an entity owned by Gary and the other Van Elslander Siblings, even though Gary knew Comfort would receive just one $1 for the Comfort Property that was worth approximately $3 million.

h.      Gary also caused the Companies to incur more than $24 million in fees and expense in connection with the Art Van Acquisition, for the benefit of himself and the other Defendants.

i.      Gary ignored these and other red flags and had a strong financial incentive to do so. Gary and the other VE Defendants, who are all close family members or entities affiliated with the VE Defendants, stood to gain more than $600 million from the Art Van Acquisition. In particular, Gary stood to gain at least $8,000,000 in the form of the GVE Bonus Transfers, plus millions more that was transferred to or for the benefit of Gary or to Gary's Trust from the purchase price for the Art Van Acquisition.

j.     Gary executed the AVASI Written Consent on behalf of AVASI, thereby, purporting to authorize, approve, and ratify the disloyal or otherwise improper acts or omissions committed by himself and others.

k.     Gary and Yost caused Art Van to enter into amendments to each other's employment agreements under which Art Van was obligated to pay each of them multi-million Bonus Transfers, for which Art Van received no value. Those amendments were not arm's-length.

374.   In addition to the foregoing, David breached his fiduciary duties to the Companies by, among other things, the following:

a.     David negotiated, signed, and implemented the Purchase Agreement on behalf of the Companies, but for the sole benefit of himself and the other Defendants.

b.     David knew the Properties would be leveraged using sale-leaseback transactions and that the Companies would be stripped of the value in their Properties, for the benefit of himself and the other Defendants.  Among other things, David signed the Purchase Agreement, which provided for the sale of the Debtors' Properties, among others, to the Buyer "or its designee" and which required the Companies to provide "any potential purchaser" of such properties with reasonable access and the right to inspect such properties and to provide certain information "reasonably necessary for any sale-leaseback financing."  David also signed documents stating he had "carefully reviewed" the closing statements under which the Properties were transferred to third party commercial landlords.

c.     Under the Purchase Agreement, David was entitled to receive information regarding the Buyer's equity commitments and debt commitments. David knew, consciously disregarded, or failed to investigate or be reasonably informed about whether the Companies could support the significant debt load and substantially increased lease obligations that were used to fund the Art Van Acquisition and the related Avoidable Transfers to David and the other Defendants.

d.     David also knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that the Art Van Acquisition was highly leveraged and extremely risky.  For example, the initial equity commitment letter provided for an equity commitment of $216 million, or about only one-third of the total purchase price.  Less than six weeks later, the equity contribution was slashed to just $70 million—around 11 %—while the remaining 89% of the purchase price would have to come from other sources, notably the sale-leaseback transactions and funded debt.

e. In addition, David knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that, as a result of the Art Van Acquisition and the related Avoidable Transfers, the Companies were insolvent and unable to pay their debts as they became due. Notably, the Companies business lost $22.5 million as of the 2017 fiscal year end, just seven months after the Closing Date, and the losses grew ever larger

f. David caused the Companies to incur more than $24 million in fees and expense in connection with the Art Van Acquisition, for the benefit of himself and the other Defendants.

g. David ignored these and other red flags and had a strong financial incentive to do so. David and the other VE Defendants, who are all close family members or entities affiliated with the VE Defendants, stood to gain more than $600 million from the Art Van Acquisition. In particular, David stood to gain at least $2,515,820 in the form of the DVE Bonus Transfers, plus millions more that was transferred to or for the benefit of David from the purchase price for the Art Van Acquisition.

h. David executed the Written Consents on behalf of the Companies, thereby, purporting to authorize, approve, and ratify the disloyal or otherwise improper acts or omissions committed by himself and others.

i. David accepted at least $2,515,820 in DVE Bonus Transfers, pursuant to an amendment to David's employment agreement with Art Van that was not arm's-length. Art Van received no benefit for the DVE Bonus Transfers.

375. Art, Gary, and David also usurped the corporate opportunities of Art Van and Comfort. Art, Gary, and David each caused Art Van and Comfort to transfer the value in their respective properties to third parties for no consideration, with all such value going to Art, Gary, David, and the other VE Defendants, who are their close family members or their affiliates. Art Van and Comfort should have had the opportunity to maximize the value of their respective Properties.

376. In addition to the foregoing, Yost breached his fiduciary duties to the Companies by, among other things, the following:

a. Upon information and belief, Yost helped to negotiate and implement the Purchase Agreement on behalf of the Companies, but for the sole benefit of himself and the other Defendants.

70

b.    Yost knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that the Properties would be leveraged using sale-leaseback transactions and that the Companies would be stripped of the value in their Properties.  Among other things, the Companies had commissioned an appraisal report of the Properties for "potential sale leaseback purposes."  Further, the Purchase Agreement provided for the sale of the Debtors' Properties, among others, to the Buyer "or its designee" and which required the Companies to provide "any potential purchaser" of such properties with reasonable access and the right to inspect such properties and to provide certain information "reasonably necessary for any sale-leaseback financing."

c.    In accordance with the terms of the Purchase Agreement, Yost was entitled to receive information regarding the Buyer's equity commitments and debt commitments. Yost knew, consciously disregarded, or failed to investigate or be reasonably informed about whether the Companies could support the significant debt load and substantially increased lease obligations that were used to fund the Art Van Acquisition and the related Avoidable Transfers to Yost and the other Defendants.

d.    Yost also knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that the Art Van Acquisition was highly leveraged and extremely risky.  For example, the initial equity commitment letter provided for an equity commitment of $216 million, or about only one-third of the total purchase price.  Less than six weeks later, the equity contribution was slashed to just $70 million—around 11 %—while the remaining 89% of the purchase price would have to come from other sources, notably the sale-leaseback transactions and funded debt.

e.    In addition, Yost knew, consciously disregarded, or failed to investigate or be reasonably informed about the fact that, as a result of the Art Van Acquisition and the related Avoidable Transfers, the Companies were insolvent and unable to pay their debts as they became due.  Notably, the Companies business lost $22.5 million as of the 2017 fiscal year end, just seven months after the Closing Date, and the losses grew ever larger.

f.    Yost ignored these and other red flags and had a strong financial incentive to do so.  In particular, Yost stood to gain at least $6,000,000 in the form of the Yost Bonus Transfers.

g.    Yost and Gary caused Art Van to enter into amendments to each other's employment agreements under which Art Van was obligated to pay each of them multi-million Bonus Transfers, for which Art Van received no value. Those amendments were not arm's-length.

377.    Because each of the Fiduciary Defendants was interested and stood to receive significant financial gains and the benefits from his Breaches of Duty, the business judgment rule does not apply and the transactions are subject to heighted scrutiny.

378.    Each of the Fiduciary Defendants negligently, intentionally, and recklessly disregarded their fiduciary obligations in engaging in, *inter alia*, the above-described conduct.

379.    None of the of the Fiduciary Defendants exercised independent or honest judgment in undertaking the above-described conduct, and the transactions described in this Complaint were undertaken in the Fiduciary Defendants' own self-interest and in the self-interest of the other Defendants, and contrary to their fiduciary duties.

380.    The acts and omissions of each of the Fiduciary Defendants as described in this Complaint are not merely poor business decisions, but rather constitute gross negligence, recklessness, and deliberate acts of self-dealing, and were not discharged in good faith or by disinterested persons.

381.    When the Fiduciary Defendants breached their fiduciary duties, the Companies were insolvent, having unreasonably small capital in relation to their business and the transaction, and having incurred debts beyond their ability to pay as such debts became due.  Therefore, creditors, as the residual beneficiaries, had standing to recover damages for the Breaches of Duty.

382.    It was reasonably foreseeable at the time that the Companies would suffer substantial harms as a result of Art Van Acquisition, the Avoidable Transfers, and the Fiduciary Defendants' Breaches of Duty, as described in this Complaint.

383.    At the time of each Breach of Duty and as of the Petition Date, there were numerous unsecured creditors holding allowable claims that would have standing to bring claims against the Fiduciary Defendants for their Breaches of Duty.

384.    Upon information and belief, the Debtors' unsecured creditors did not know and could not have known about the Breaches of Duty when they were committed by the Fiduciary Defendants.

385.    Indeed, the Debtors' unsecured creditors would have had no reason to know about the Breaches of Duty.  The Debtors were privately held companies and, upon information and belief, their financial statements and other corporate documents were not publicly available.

386.    The Fiduciary Defendants, despite owing fiduciary duties to the Companies, did not disclose their Breaches of Duty, to the detriment of the Debtors' unsecured creditors.

387.    In fact, the Fiduciary Defendants, acting on their own behalf and on behalf of or for the benefit of some or all of the other Defendants, engaged in one or more affirmative acts that concealed the Breaches of Duty.  Such affirmative acts included, without limitation, the transfers of ownership of certain real properties shortly before or immediately after the Closing Date; the transfers of equity ownership of certain Debtors shortly before the Closing Date; the conversions of certain entities from Michigan corporations to Delaware limited liability companies on the eve of the Closing Date; and the use of sale-leaseback transactions and funded debt to strip value out of the Company; among other things.  And, notably, after the Closing Date, both Gary and Yost remained on the board.

388.    Accordingly, the Trustee is entitled to judgment in an amount to be determined at trial holding the Fiduciary Defendants jointly and severally liable for their Breaches of Fiduciary Duty as set forth in this Twelfth Count.

## THIRTEENTH COUNT – BREACHES OF FIDUCIARY DUTY
### (ADDITIONAL BREACHES BY GARY VAN ELSLANDER)
#### Pursuant to 11 U.S.C. § 544 and Applicable State Law
#### Against Defendant Gary A. Van Elslander

389.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

390.     From on or about March 1, 2017 through on or about March 1, 2020, Gary was a director of Holdco and of the other Debtors.

391.     As a director of Holdco and the other Debtors, Gary owed fiduciary duties of care, loyalty and good faith.

392.     Gary breached his fiduciary duties to the Debtors by knowingly, recklessly, or with willful blindness acting in a manner inconsistent with his fiduciary duties.  As set forth in detail in this Complaint, Gary had actual or constructive knowledge that his conduct was legally improper and a breach of fiduciary duty.

393.     Gary knew, consciously disregarded, or failed to investigate and reasonably inform himself of the fact that the Levin Acquisition and the Wolf Acquisition were undertaken at a time when the Debtors were insolvent, had unreasonably small capital in relation to their business or the transaction, and had incurred debts beyond the Debtors' ability to pay as such debts became due.

394.     In addition to the foregoing, Gary breached his fiduciary duties to the Debtors by, among other things, the following:

     a.     Gary failed to take appropriate steps to address the massive funded debt liabilities and future lease obligations incurred to fund the Art Van Acquisition and the Avoidable Transfers to Gary and to the other Defendants.

     b.     Gary authorized and approved the Levin Acquisition even though the Debtors had already lost approximately $22.5 million in fiscal year 2017 and were in financial distress.

c.   Gary authorized and approved the Wolf Acquisition even though the Debtors had already lost approximately $22.5 million in fiscal year 2017 and were in financial distress.

d.   Gary authorized and approved the Debtors borrowing, among other things, an additional $80,000,000 in term loan debt to finance the Levin Acquisition and the Wolf Acquisition, which the Debtors could not repay.  As a result of the additional borrowings used to finance the Levin Acquisition and the Wolf Acquisition, the Debtors were obligated to pay millions of dollars per year in additional interest expenses, which the Debtors could not pay.

e.   Gary authorized and approved the Debtors entering into, among other things, sale-leaseback transactions in connection with the Levin Acquisition and the Wolf Acquisition, which caused the Debtors' total future lease obligations to increase to more than $1,239,000,000, an increase of approximately $362,000,000 prior to the Levin Acquisition and the Wolf Acquisition.  These sale-leaseback transactions increased the Debtors' annual minimum lease payments by at least $27 million, which the Debtors could not pay.

f.   Gary caused the Debtors to incur $10.4 million in fees and expenses in connection with the Levin Acquisition and the Wolf Acquisition, which the Debtors could not afford.

g.   Gary authorized and approved, or acquiesced in, the Debtors paying at least $7,358,000 in Management Fees at a time when the Debtors were insolvent, had unreasonably small capital in relation to their business or the transaction, and were incurring debts beyond their ability to pay as such debts became due.

h.   Gary authorized and approved, or acquiesced in, Holdco making at least $1,000,000 in Yost 2018 Transfers at a time when the Debtors were insolvent, had unreasonably small capital in relation to their business and the transaction, and were incurring debts beyond their ability to pay as such debts because due.

395.   Because Gary was interested and stood to receive significant benefits from these Breaches of Duty, including without limitation concealing his earlier Breaches of Duty, the business judgment rule does not apply and the transactions are subject to heighted scrutiny.

396.   Gary negligently, intentionally, and recklessly disregarded their fiduciary obligations in engaging in, *inter alia*, the above-described conduct.

397.    Gary did not exercise independent or honest judgment in undertaking the above-described conduct, and the transactions described in this Complaint were undertaken in their own self-interest and in the self-interest of the other Defendants or other parties, and contrary to their fiduciary duties.

398.    The acts and omissions of Gary as described in this Complaint are not merely poor business decisions, but rather constitute gross negligence, recklessness, and deliberate acts of self-dealing, and were not discharged in good faith or by disinterested persons.

399.    It was reasonably foreseeable at the time that the Companies would suffer substantial harms as a result of Levin Acquisition, the Wolf Acquisition, and Gary's Breaches of Duty, as described in this Complaint.

400.    At the time of each of Gary's Breach of Duty and as of the Petition Date, there were numerous unsecured creditors holding allowable claims that would have standing to bring claims against Gary for his Breaches of Duty.

401.    Accordingly, the Trustee is entitled to judgment against Gary in an amount to be determined at trial for the harms resulting from his Breaches of Duty.

**FOURTEENTH COUNT – BREACHES OF FIDUCIARY DUTY
(ADDITIONAL BREACHES BY RICHARD KIM YOST)
Pursuant to 11 U.S.C. § 544 and Applicable State Law
<u>Against Defendant Richard Kim Yost</u>**

402.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

403.    From on or about March 1, 2017 through in or about June 2018, Yost was a director and an officer of Holdco and of the other Debtors.

404.    As a director and officer of Holdco and the other Debtors, Yost owed fiduciary duties of care, loyalty and good faith.

405.     Yost breached his fiduciary duties to the Debtors by knowingly, recklessly, or with willful blindness acting in a manner inconsistent with his fiduciary duties.  As set forth in detail in this Complaint, Yost had actual or constructive knowledge that his conduct was legally improper and a breach of fiduciary duty.

406.     Yost knew, consciously disregarded, or failed to investigate and reasonably inform himself of the fact that the Levin Acquisition and the Wolf Acquisition were undertaken at a time when the Debtors were insolvent, had unreasonably small capital in relation to their business or the transaction, and had incurred debts beyond the Debtors' ability to pay as such debts became due.

407.     In addition to the foregoing, Yost breached his fiduciary duties to the Debtors by, among other things, the following:

  a.     Yost failed to take appropriate steps to address the massive funded debt liabilities and future lease obligations incurred to fund the Art Van Acquisition and the Yost Bonus Transfers, among other things.

  b.     Yost authorized and approved the Levin Acquisition even though the Debtors had already lost approximately $22.5 million in fiscal year 2017 and were in financial distress.

  c.     Yost authorized and approved the Wolf Acquisition even though the Debtors had already lost approximately $22.5 million in fiscal year 2017 and were in financial distress.

  d.     Yost signed the Levin Stock Purchase Agreement and the Wolf Asset Purchase Agreement on behalf of the respective buyers.

  e.     Yost authorized and approved the Debtors borrowing, among other things, an additional $80,000,000 in term loan debt to finance the Levin Acquisition and the Wolf Acquisition, which the Debtors could not repay.  As a result of the additional borrowings used to finance the Levin Acquisition and the Wolf Acquisition, the Debtors were obligated to pay millions of dollars per year in additional interest expenses, which the Debtors could not pay.

  f.     Yost authorized and approved the Debtors entering into, among other things, sale-leaseback transactions in connection with the Levin Acquisition and the Wolf Acquisition, which caused the Debtors' total future lease

obligations to increase to more than $1,239,000,000, an increase of approximately $362,000,000 prior to the Levin Acquisition and the Wolf Acquisition. These sale-leaseback transactions increased the Debtors' annual minimum lease payments by at least $27 million, which the Debtors could not pay.

g.      Yost caused the Debtors to incur $10.4 million in fees and expenses in connection with the Levin Acquisition and the Wolf Acquisition, which the Debtors could not afford.

h.      Yost authorized and approved, or acquiesced in, the Debtors paying multi-million Management Fees at a time when the Debtors were insolvent, had unreasonably small capital in relation to their business or the transaction, and were incurring debts beyond their ability to pay as such debts became due.

i.      Yost sought and accepted the $1,000,000 Yost 2018 Transfer at a time when the Debtors were insolvent, had unreasonably small capital in relation to their business and the transaction, and were incurring debts beyond their ability to pay as such debts because due.

408.    Because Yost was interested and stood to receive significant benefits from these Breaches of Duty, including without limitation concealing his earlier Breaches of Duty, the business judgment rule does not apply and the transactions are subject to heighted scrutiny.

409.    Yost negligently, intentionally, and recklessly disregarded their fiduciary obligations in engaging in, *inter alia*, the above-described conduct.

410.    Yost did not exercise independent or honest judgment in undertaking the above-described conduct, and the transactions described in this Complaint were undertaken in their own self-interest and in the self-interest of the other Defendants or other parties, and contrary to their fiduciary duties.

411.    The acts and omissions of Yost as described in this Complaint are not merely poor business decisions, but rather constitute gross negligence, recklessness, and deliberate acts of self-dealing, and were not discharged in good faith or by disinterested persons.

412.    It was reasonably foreseeable at the time that the Companies would suffer substantial harms as a result of Levin Acquisition, the Wolf Acquisition, and Yost's Breaches of Duty, as described in this Complaint.

413.    At the time of each of Yost's Breach of Duty and as of the Petition Date, there were numerous unsecured creditors holding allowable claims that would have standing to bring claims against Yost for his Breaches of Duty.

414.    Accordingly, the Trustee is entitled to judgment against Yost in an amount to be determined at trial for the harms resulting from his Breaches of Duty.

**FIFTEENTH COUNT – AIDING AND ABETTING BREACHES OF
FIDUCIARY DUTY BY ARCHIE A. VAN ELSLANDER
Pursuant to 11 U.S.C. § 544 and Applicable State Law, Including
Without Limitation Michigan State Law and Delaware State Law
<u>Against Archie A. Van Elslander Trust dated November 26, 1982, as Amended</u>**

415.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

416.    A defendant is liable for aiding and abetting a breach of fiduciary duty where (i) a fiduciary relationship exists; (ii) the fiduciary breaches its duty; (iii) the defendant knowingly participates in that breach and gives substantial assistance or encouragement to the fiduciary; and (iv) the plaintiff's damages were proximately caused by the breach.

417.    As discussed in detail above, Art was the sole director of Art Van and was one of the directors of the other Companies and, therefore, Art owed the Companies fiduciary duties of care, loyalty and good faith.

418.    As also discussed in detail above, Art repeatedly breached his fiduciary duties owed to the Companies.

419.    At the same time, Art was the trustee of the Archie A. Van Elslander Trust dated November 26, 1982, as Amended (the "Trust"), the shareholder of each of the Companies.

420.    The Trust knowingly participated in and gave substantial assistance and encouragement to Art's Breaches of Duty.

421.    There is a complete overlap between the Trust and the board of Art Van and substantial overlap between the Trust and the boards of Comfort and AVASI.  At all times relevant to this Count, Art was both the trustee of the Trust, the sole director of Art Van, and a director of Comfort and AVASI, the other directors of which were certain of Art's children.

422.    The Trust, which acted by and through Art, is charged with knowledge of Art's fiduciary relationships to the Companies and Art's Breaches of Duty.

423.    The Trust was intricately involved in every aspect of the Art Van Acquisition. Upon information and belief, the Trust, as the sole shareholder of the Companies, established the terms of the Art Van Acquisition, including the stripping of equity from the Art Van Properties and the Comfort Property through the sale lease-back transactions.

424.    Art, the trustee of the Trust, certainly was aware of the sale-leaseback transactions. In fact, he signed documents in connection with the closing which stated that he had "carefully reviewed" certain real estate closing statements that showed the Headquarters and other Art Van Properties and the Comfort Property were being stripped out and sold to the Landlords.

425.    Art also signed the Purchase Agreement, both in his capacity as the trustee of the Trust and on behalf of each of the Companies.

426.    The Trust provided other substantial assistance and encouragement as well.  For example, certain real properties that were owned by the Trust were included as part of the sale-leaseback transactions that provided 70% of the total purchase price.  The Trust had a strong

motivation for the Art Van Acquisition to close, contrary to the fiduciary duties Art owed while wearing his other hat as a director of the Companies.

427.    The Trust was, by far, the largest beneficiary of the stripping of assets and other highly leveraged aspects of the Art Van Acquisition.  According to the Funds Flow Calculation, the Trust received at least $529,260,163 of the purchase price.  While the Trust collected more than half a billion dollars at closing, the Companies were insolvent, had unreasonably small capital in relation to their business and the transaction, and had incurred debts beyond their ability to pay as such debts became due.

428.    Art's Breaches of Duties, aided and abetted by the Trust, directly and proximately caused substantial damages to the Debtors, their estates, and creditors, in an amount to be determined at trial.

429.    The fact that the Trust was the sole shareholder of the Companies in no way limits the fiduciary duties owed by Art to the Companies nor the Trust's liability for aiding and abetting Art's Breaches of Duty.  As discussed in detail above, when Art breached his fiduciary duties, the Companies were insolvent, had unreasonably small capital in relation to their business and the transaction, and had incurred debts beyond their ability to pay as such debts became due. Therefore, creditors, as the residual beneficiaries, had standing to recover damages for Art's Breaches of Duty.  At the time of each Breach of Duty and as of the Petition Date, the Companies had numerous unsecured creditors holding allowable claims that would have standing to bring claims against the Fiduciary Defendants for their Breaches of Duty.  Accordingly, the Trustee, as the representative of the Companies, and as the representative of the bankruptcy estates and creditors, is entitled to recover damages for the harms caused by the Fiduciary Defendants' Breaches of Duty.

430.    The Trustee is entitled to judgment against the Trust, in an amount to be determined at trial for the harms resulting from the Trust aiding and abetting the Fiduciary Defendants' Breaches of Duty.

**SIXTEENTH COUNT – RECOVERY OF AVOIDABLE TRANSFERS**
**Pursuant to 11 U.S.C. § 550**
**Against All Defendants**

431.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

432.    The Property Transfers were made to or for the benefit of each VE Defendant.

433.    Pursuant to 11 U.S.C. § 550 and applicable state and non-bankruptcy law, the Trustee is entitled to avoid and recover the Property Transfers from the VE Defendants.

434.    The GVE Bonus Transfers were made to or for the benefit of Gary A. Van Elslander.

435.    Pursuant to 11 U.S.C. § 550 and applicable state and non-bankruptcy law, the Trustee is entitled to avoid and recover the GVE Bonus Transfers from Gary A. Van Elslander

436.    The DVE Bonus Transfers were made to or for the benefit of David P. Van Elslander.

437.    Pursuant to 11 U.S.C. § 550 and applicable state and non-bankruptcy law, the Trustee is entitled to avoid and recover the DVE Bonus Transfers from David P. Van Elslander.

438.    The Yost Bonus Transfers and the Yost 2018 Transfers were made to or for the benefit of Richard Kim Yost.

439.    Pursuant to 11 U.S.C. § 550 and applicable state and non-bankruptcy law, the Trustee is entitled to avoid and recover the Yost Bonus Transfers and the Yost 2018 Transfers from Richard Kim Yost.

440.    As set forth more fully above, the Defendants are the initial transferees, or the immediate, mediate, or subsequent transferee, of one or more of the Avoidable Transfers.

441.    Moreover, the Trustee may recover, and intends to recover, the Avoidable Transfers and benefits therefrom from any and all mediate, intermediate, or subsequent transferees.

442.    Accordingly, the Trustee is entitled to recover the transfers and benefits as detailed hereinabove, plus interest, pursuant to 11 U.S.C. § 550 and applicable state and non-bankruptcy law.

### SEVENTEENTH COUNT – DISALLOWANCE OF PROOFS OF CLAIM
**Pursuant to 11 U.S.C. § 502**
**Against Defendants Archie A. Van Elslander Trust dated November 26, 1982, as Amended and Gary A. Van Elslander, and VEV Real Estate, LLC**

443.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

444.    On June 8, 2020, the "Archie A. Van Elslander Trust & Gary Van Elslander" filed an unliquidated proof of claim against Debtor AVF Parent, LLC, which was designated claim number 15 on the official claims register.

445.    On June 16, 2020, VEV Real Estate LLC ("VEV") filed a proof of claim against Debtor Art Van Furniture, LLC in the amount of approximately $99,227.38, which was designated claim 3248 on the official claims register.

446.    As set forth in detail in this Complaint, the Trust, Gary, and VEV are each an entity from whom the Trustee may recover property under 11 U.S.C. § 550 and are also a transferee of one or more of the Avoidable Transfers, which are avoidable under 11 U.S.C. §§ 544, 548, and 550.

447.    The Trust, Gary, and VEV have not paid the amount, or turned over the property, for which he or it is liable under 11 U.S.C. §§ 544, 548, and 550.

448.    Accordingly, pursuant to 11 U.S.C. § 502, the proofs of claim filed by Trust and Gary and by VEV should be disallowed.

## ATTORNEY'S FEES

449.    Based upon Fiduciary Defendants' egregious conduct, bad faith, numerous breaches of duty, and other misconduct as set forth in this Complaint, which should be imputed to each of the other Defendants, who directly benefited from such misconduct, Plaintiff seeks an award of his reasonable attorney's fees and expenses incurred in connection with investigating, filing, and prosecuting this action.

## RESERVATION OF RIGHTS

450.    During the course of this proceeding, Plaintiff may learn through discovery or otherwise of additional claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law.  Plaintiff reserves all rights to amend this original Complaint to, among other things, (i) modify of and/or revise to Defendants' names; (ii) add defendants; and/or (iii) add claims or causes of action, if applicable (collectively, the "Amendments"), that may become known to Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the filing of this original Complaint.

## CONCLUSION

WHEREFORE, Plaintiff Alfred T. Giuliano, solely in his capacity as the Chapter 7 Trustee of Art Van Furniture, LLC, *et al.*, demands judgment in his favor and against each of the Defendants, as follows:

    a.    The entry of a judgment in favor of Plaintiff and against each of the VE Defendants avoiding and recovering the Property Transfers, in amounts to be determined at trial;

b.      The entry of a judgment in favor of Plaintiff and against Defendant Gary A. Van Elslander avoiding and recovering the GVE Bonus Transfers in an amount of not less than $8,000,000;

c.      The entry of a judgment in favor of Plaintiff and against Defendant David P. Van Elslander avoiding and recovering the DVE Bonus Transfers in an amount of not less than $2,515,820;

d.      The entry of a judgment in favor of Plaintiff and against Defendant Richard Kim Yost avoiding and recovering the Yost Bonus Transfers and the Yost 2018 Transfers in an aggregate amount of not less than $7,000,000;

e.      The entry of a judgment in favor of Plaintiff and against Defendants the estate of Archie A. Van Elslander, Gary A. Van Elslander, David P. Van Elslander, and Richard Kim Yost, jointly and severally, in an amount to be determined at trial, on account of their Breaches of Duty as set forth in the Twelfth Count;

f.      The entry of a judgment in favor of Plaintiff and against Defendant Gary A. Van Elslander, in an amount to be determined at trial, on account of his Breaches of Duty as set forth in the Thirteenth Count;

g.      The entry of a judgment in favor of Plaintiff and against Defendant Richard Kim Yost, in an amount to be determined at trial, on account of his Breaches of Duty as set forth in the Fourteenth Count;

h.      The entry of a judgment in favor of Plaintiff and against Defendant Archie A. Van Elslander Trust dated November 26, 1982, as Amended, in an amount to be determined at trial, on account of its aiding and abetting of the Breaches of Duty by Archie A. Van Elslander;

i.      The entry of a judgment in favor of Plaintiff declaring that all avoidable transfers are recoverable against any mediate, intermediate, and/or subsequent transferee;

j.      The entry of a judgment in favor of Plaintiff disallowing the proofs of claim filed by the Trust and Gary and by VEV;

k.      An award of reasonable attorneys' fees and costs;

l.      An award of pre- and post-judgment interest; and

m.    Such additional relief as this Court deems just and equitable.

Dated: March 7, 2022

**ARCHER & GREINER, P.C.**

*/s/ David W. Carickhoff*
David W. Carickhoff (No. 3715)
Bryan J. Hall (No. 6285)
300 Delaware Ave., Suite 1100
Wilmington, DE 19801
(302) 777-4350
(302) 777-4352 (fax)
dcarickhoff@archerlaw.com
bjhall@archerlaw.com

-and-

Stephen M. Packman, Esq.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
(215) 963-3300
(215) 963-9999 (fax)
spackman@archerlaw.com

*Counsel to Alfred T. Giuliano, solely in his capacity as the Chapter 7 Trustee of Art Van Furniture, LLC, et al.*